Argued and submitted June 27, affirmed November 23, 1988

## BENZ et al,
*Petitioners,*

*v.*

## WATER RESOURCES COMMISSION et al,
*Respondents.*

(WRC 65587, R-68108; CA A44699)

764 P2d 594

William H. Holmes, Portland, argued the cause for petitioners. With him on the briefs was Stoel, Rives, Boley, Jones & Grey, Portland.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondents Water Resources Commission and Water Resources Department. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

John A. Berge, Bend, argued the cause for respondent Lemmie O. Rockford. With him on the brief was Gray, Fancher, Holmes & Hurley, Bend.

Before Buttler, Presiding Judge, and Rossman and Riggs, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioners seek review of an order of the Water Resources Commission approving applications for the diversion of water from Kelly Creek, Tandy Creek and an unnamed drainageway in Lake County by respondent Rockford, for irrigation, greenhouse use and soil leaching (Application No. 65587) and the construction of a reservoir to impound water for greenhouse use and field irrigation (Application No. R-68108).[1] We review the Commission's order pursuant to ORS 183.482, for substantial evidence on the whole record and for errors of law. ORS 536.075(3).

Kelly and Tandy Creeks flow westerly, crossing the lands of petitioners and Rockford, and drain naturally into Goose Lake. Petitioners are senior appropriators of water from Tandy Creek. During the irrigation season, which begins on March 15 and ends on September 1 of each year, they divert water for irrigation and stockwatering. Rockford, the applicant, irrigates his land during the irrigation season by pumping groundwater that has a high boron content. The resulting boron build-up has reduced Rockford's alfalfa production by 50 percent and is lethal to the growing of roses, one of Rockford's proposed greenhouse crops. Leaching of the soil by the application of large quantities of uncontaminated water is effective in reducing boron concentrations to levels that will not harm roses.

Rockford's applications sought appropriations from Kelly Creek, when available, and any deficiency to be diverted from Tandy Creek, with any deficiency from Kelly and Tandy Creeks to be diverted from an unnamed drainageway, with any further deficiency to be made up from waters stored in the proposed reservoir. The Commission's order approves the granting of permits for the construction of the reservoir, the diversion from the proposed sources of 5.48 cubic feet per second (cfs) of water for irrigation of 219 acres during the irrigation season, 4.44 cfs for greenhouse irrigation during the irrigation season, and 4.94 cfs for soil leaching and greenhouse use outside of the irrigation season.

Petitioners contend that the granting of the permits

---

[1] The applications were consolidated for the purpose of the hearing, resulting in a single order disposing of both.

was improper for several reasons: (1) Boron leaching, one of Rockford's proposed uses, is not a "beneficial use" for which water may be appropriated; (2) Rockford has the burden of proof and should have, but has not, established that Tandy Creek contains water in excess of petitioners' prior appropriations during the periods when Rockford wants to use water; (3) statements in the Commission's order indicate that the Commission unlawfully permits over-appropriation by granting applications regardless of possible conflicts between water users or the amount of water available, on the theory that the rule of prior appropriations will avoid all conflicts; and (4) the record shows that Rockford has taken water from Kelly Creek without a permit and that the watermaster cannot regulate Rockford's proposed appropriation, thereby indicating that the appropriation will "inevitably" conflict with petitioner's existing rights.

To constitute a valid appropriation of water, the user must have an intent to apply the water to some beneficial use. *In Re Waters of Deschutes River,* 134 Or 623, 286 P 563, 294 P 1049 (1930). ORS 540.610 provides that "[b]eneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." We first address the question whether boron leaching is a beneficial use.

Although "beneficial use" is not defined in the statutes, certain enumerated uses are considered to be beneficial: "[E]xisting and contemplated needs and uses of water for domestic, municipal, irrigation, power development, industrial, mining, recreation, wildlife, and fish life uses and for pollution abatement * * *." ORS 536.300; *see also* ORS 537.170(5). Petitioners contend that the regular flushing into the water table of boron accumulated after each irrigation season cannot be characterized as a "beneficial use," at least not without affirmative proof from the applicant that (1) the proposed use is beneficial and (2) that it is not harmful to other appropriators or to the public interest. The record, they contend, is devoid of such evidence.

■ There is evidence that the application of large amounts of stream water during the nonirrigation season reduces the boron concentration to a level at which the boron becomes unavailable to plants. The record does not show the optimum rate of application or the actual amount of water

necessary to leach accumulated boron. The Commission found that the successful leaching of boron from the root zone of the soil will restore the crop productivity of the land, will result in a benefit to Rockford and will also contribute to the maximum economic benefit of the community. Substantial evidence supports those findings, which are sufficient to support the Commission's conclusion that the leaching of boron is a beneficial use.

■ The Commission's order imposes recording and reporting requirements on Rockford, including the measurement of water applied to the soil and the taking of soil samples, designed to determine whether the application of water was effective in leaching boron, and, if so, the quantity of water necessary for optimum results. It also found that, because boron leaching will require the application of large quantities of water, boron leaching is of less benefit overall than other potential future uses, junior in priority to the subject application, for which water should be conserved. Accordingly, it allowed the appropriation for boron leaching on the condition that it be "subordinate and inferior to both the storage and direct use of water for other consumptive beneficial uses of water." Petitioner contends that the Commission has thereby relegated the term "beneficial" to a "comparative" standard, when it is intended to be "absolute." Their incorrect assumption is that the Commission made its determination that the leaching of boron is a beneficial use only after it had determined that the water, if not applied to that use, would be wasted. It is clear to us that the Commission decided that the leaching of boron is a beneficial use apart from conflicting uses or other concerns. It could not, however, grant Rockford's permit without going through the process of balancing the proposed use against other beneficial uses, conflicting interests and concerns, *see* ORS 537.120;[2] ORS

---

[2] ORS 537.120 provides:

"Subject to existing rights, and except as otherwise provided in ORS chapter 538, all waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act and not otherwise; but nothing contained in the Water Rights Act shall be so construed as to take away or impair the vested right of any person to any water or to the use of any water."

537.160(1);[3] ORS 537.170(5);[4] *In Re Waters of Deschutes River, supra,* 134 Or at 668; *Cantrall v. Sterling Mining Co.,* 61 Or 516, 122 P 42 (1912), and the conditions it placed on Rockford's use of the water reflect the Commission's recognition of those concerns.

■ Petitioners contend that, in finding that boron leaching is a beneficial use, without requiring proof from Rockford that it is not a harmful use, the Commission incorrectly applied a "presumption" that the proposed use is beneficial. As we have previously stated, there is substantial evidence to support the Commission's finding that the use is beneficial. Petitioners' view would effectively require a presumption that a proposed use is harmful unless it is shown not to be. There is no indication that the legislature intended that to be the case. ORS 537.160(1) provides that the Commission "*shall* approve all applications made in proper form which contemplate the application of water to a beneficial use, unless the proposed use conflicts with existing rights." (Emphasis supplied.) Given that Rockford made a *prima facie* case for a beneficial use, the burden of coming forward with evidence that boron leaching would be harmful to them or to the public interest is

---

[3] ORS 537.160(1) provides:

"Subject to the provisions of subsections (2) and (3) of this section, and of ORS 537.170 to 537.190, the Water Resources Commission shall approve all applications made in proper form which contemplate the application of water to a beneficial use, unless the proposed use conflicts with existing rights."

[4] ORS 537.170(5) provides:

"(5) In determining whether the proposed use would impair or be detrimental to the public interest, the Water Resources Commission shall consider:

"(a) Conserving the highest use of the water for all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing and wildlife, fire protection, mining, industrial purposes, navigation, scenic attraction or any other beneficial use to which the water may be applied for which it may have a special value to the public.

"(b) The maximum economic development of the waters involved.

"(c) The control of the waters of this state for all beneficial purposes, including drainage, sanitation and flood control.

"(d) The amount of waters available for appropriation for beneficial use.

"(e) The prevention of wasteful, uneconomic, impractical or unreasonable use of the waters involved.

"(f) All vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights.

"(g) The state water resources policy formulated under ORS 536.300 to 536.350 and 537.505 to 537.525."

on petitioners. *See* ORS 183.450(2).[5] They offered no evidence to that effect. In any event, it is apparent that the Commission considered potential harmful effects of the boron leaching, because it found specifically that the proposed appropriation would cause no adverse effect on Goose Lake, and concluded separately that it will not impair or be detrimental to the public interest. That conclusion is supported by the record, as there is no evidence that any harm would be caused by boron leaching.

We turn to petitioners' contention that, in the absence of substantial evidence that there is water in Tandy Creek in excess of prior appropriations, the Commission should have concluded that the proposed appropriation would conflict with existing uses. In fact, the evidence is in conflict as to the existence of excess water. Petitioner Margaret Benz testified that petitioners historically have used the entire flow from Tandy Creek during the irrigation season to satisfy their existing water rights. Rockford testified that, during the irrigation season, Tandy Creek contains water in excess of petitioners' prior rights. Petitioners impeached Rockford's testimony by showing that his estimate of water flow is based on observations made at a spot below petitioners' diversion point, where the creek contains flow from another creek, and not upstream, near petitioners' diversion point and Rockford's proposed diversion point. The watermaster also testified that there is excess water flowing in Tandy Creek during the irrigation season. On cross-examination, however, he admitted that he had not taken measurements on Tandy Creek.

Petitioners offered evidence that little or no water flows through Tandy Creek outside the irrigation season, because of freezing and a lack of rain. Rockford testified that Tandy Creek contains unappropriated water during the fall and winter.

The Commission found that Kelly and Tandy Creeks carry mostly seasonal snowmelt runoff. It found that there is little or no flow in Tandy Creek during the winter months, and

---

[5] ORS 183.450(2) provides, in part:

"The burden of presenting evidence to support a fact or position in a contested case rests on the proponent of the fact or position."

that the flow usually begins with the spring thaw in February or early March and is depleted by mid-June to early July. There are no established measuring devices on any of the waterways, and flow measurements have not been obtained to establish normal flow. The Commission found:

> "At times, there is water flowing in Kelly Creek in excess of the needs of prior existing rights, although the frequency and amount of such excess water is not established.
>
> "It is possible that water in excess of existing rights flows from Tandy Creek to Goose Lake at times. However, there was testimony that existing rights can consume all water in Tandy Creek."

It also made this "ultimate finding":

> "The record conflicts as to the amount, frequency, and seasonal occurrence of flows in excess of existing rights to water from Tandy Creek, Kelly Creek and the unnamed drainage ways."

The Commission made no finding as to whether there is water flowing in Tandy Creek when the water in Kelly Creek has been depleted. It apparently concluded, however, that whether or not there is regular excess flow in Tandy Creek is not the ultimate question in determining whether the proposed appropriation would conflict with existing rights:

> "[Petitioners] submit that an appropriation 'will "conflict with existing rights" unless the source at issue contains water in excess of prior appropriations.' [Petitioners] argue that the Commission may not approve the Rockford permits absent a showing of available unappropriated water sufficient to support the proposed uses.
>
> "The Commission is charged with securing the maximum beneficial use and control of the state's water resources. ORS 536.220, 536.310, 537.170(5)(b). Because streamflows vary greatly from year to year, disallowing further permits once the reliable flow had been appropriated would result in nonuse of the excess water available in years of greater than average water supply. *It is the Commission's position that maximum beneficial use of the waters of the state is achieved by issuing a permit to anyone who is willing to attempt appropriation and use of whatever unappropriated water may become available,* except where a basin program identifies a need to set aside some amount of unappropriated water for particular future uses." (Emphasis supplied.)

Petitioners contend that the emphasized portion of the Commission's statement shows that the Commission has ignored the requirements of ORS 537.170(5)(d) and (f) that, in reviewing an application, it must consider "the amount of waters available for appropriation for beneficial use" and protect "all vested and inchoate rights to the waters of this state or to the use of the waters of this state." First, the record shows that the Commission did consider those two criteria. The order contains extensive discussion of each of them. Second, as the Commission concluded, under the law of prior appropriations, *see, e.g.,* ORS 537.120, a senior appropriator who applies water to a beneficial use and thereafter continues to do so holds a water right that is superior to any water right obtained by a subsequent junior appropriator. In view of that rule, the Commission did not err in concluding that knowledge of the precise quantity of water available in excess of prior appropriations is not necessary. A junior appropriator's water right cannot be exercised until the senior appropriator's right has been satisfied.

The corollary rule is that a party who has a prior right to a certain quantity of water from a watercourse is entitled to the water only to the extent needed for the use to which it has been appropriated; when not needed or used for that purpose, the next person in priority is entitled to it. *Jones v. Warmsprings Irrigation Dist.,* 162 Or 186, 198, 91 P2d 542 (1939). Petitioners' right of prior appropriation to the water in Tandy Creek is not total and absolute. The Commission's order properly permits diversion by Rockford only to the extent that there is water then available in excess of petitioners' prior appropriation rights.

Although petitioners agree that the Commission's analysis may be correct in the abstract, they contend that, as a practical matter, their rights are threatened. The record shows that, on one occasion, in the non-irrigation season, Rockford appropriated large quantities of water from Kelly Creek while his application for a permit for appropriation was pending, for the purpose of conducting experiments as to the effectiveness of boron leaching. In view of Rockford's documented alleged misconduct, *see* ORS 537.130, and the finding of the Commission that the watermaster is not equipped to monitor the diversion of water from Tandy Creek, they argue that the

application should be denied. Petitioners' concerns are addressed in the Commission's opinion:

"* * * ORS 540.045 provides, in part: '[E]ach watermaster shall: (1) Regulate the distribution of water among the various users of water from any natural surface or groundwater supply in accordance with the users' existing water rights of record in the office of the Water Resources director. * * * (3) Divide the waters of the natural surface and groundwater sources and other sources of water supply among canals, ditches, pumps, pipelines and reservoirs taking water from the source for beneficial use, by regulating, adjusting and fastening the headgates, valves or other control works at the several points of diversion of surface water or groundwater, according to the users' relative entitlements to water.'

"* * * The water users have the obligation under the law to install and maintain adequate control and measuring devices at their several points of diversion of water from the natural source so that the watermaster can regulate the distribution of the available water."

The Commission did not, as petitioners contend, ignore practical concerns in allowing the Rockford appropriation. Although Tandy Creek presently contains no measuring devices, the Commission did not err in concluding that petitioners' interests will be protected adequately against unlawful appropriation through the implementation of controls and the imposition of conditions on the proposed appropriation, including the construction and installation of recording and measuring devices on petitioners' land at each point of Rockford's diversion on Tandy Creek that is upstream from petitioners' authorized point of diversion.

Affirmed.