Argued and submitted November 3, 2022, affirmed November 1, 2023.

In the Matter of Water Right Application R-87871
in the Name of
EAST VALLEY WATER DISTRICT,
*Petitioner,*
*v.*
OREGON WATER RESOURCES COMMISSION,
OREGON WATER RESOURCES DEPARTMENT,
and WATERWATCH OF OREGON, INC.,
*Respondents,*
*and*
Joel RUE et al.,
Protestants below.

Oregon Water Resources Commission
R87871; A173292

539 P3d 789

Petitioner East Valley Water District (district) petitions for judicial review of a final order of the Oregon Water Resources Commission (commission). In that order, the commission denied the district's application for a permit that would allow storage of water from Drift Creek in a reservoir. At issue, among other things, was a potential conflict between the proposed reservoir and an existing instream water right in Drift Creek, established in Certificate 72591. Although the proposed use would not "injure" the existing water right, the commission determined that granting the application for the new water storage right conflicted with the purpose of the existing instream water right and therefore the application had to be denied. The district raises seven assignments of error: (1) alleging that the commission did not have the necessary legal discretion to deny the application based on a perceived deficiency in the director's final order that was not specifically raised by the protestants' exceptions; (2) - (4) alleging that the commission erroneously interpreted ORS 537.170(8)(f) specifically, ORS 537.170(8) generally, and Certificate 72591 and the statutes governing instream water rights; (5) contending that the commission improperly shifted the burden of proof to the district to demonstrate an absence of impairment or detriment of the public interest, contrary to ORS 537.153(2); and (6) - (7) contending that some of the commission's conclusions were not supported by substantial evidence or substantial reason. Respondents Oregon Water Resources Department and the commission contend that the commission did not err as alleged by the district. Respondent WaterWatch of Oregon (WaterWatch) disagrees with the commission's determination that the proposed permit would not "injure" existing water rights and raises a cross-assignment of error. *Held*: The record supports the respondents' contention that the issue of a deficiency in the director's final order was sufficiently raised for its consideration to be within the commission's authority. The commission did not err in its interpretation of the relevant statutes or in its consideration and interpretation of Certificate 72591. The commission

reasonably determined that the presumption that a proposed water use will not impair or be detrimental to the public interest was overcome; consequently, it was the district's burden to prove that its proposed use would not impair or be detrimental to the public interest and that its application should be granted. Finally, the record provided substantial evidence and the commission's final order provided substantial reason for the commission to reasonably reach its conclusions. The court did not reach WaterWatch's cross-assignment of error.

Affirmed.


Crystal S. Chase argued the cause for petitioner. Also on the briefs were Stoel Rives LLP and Kirk B. Maag.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondents Oregon Water Resources Commission and Oregon Water Resources Department. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Thomas M. Christ argued the cause for respondent WaterWatch of Oregon, Inc. Also on the briefs were Brian J. Posewitz and Sussman Shank LLP.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

Petitioner East Valley Water District (district) petitions for judicial review of a final order of the Oregon Water Resources Commission (commission). In that order, the commission denied the district's application for a permit that would allow storage in a reservoir of 12,000 acre-feet of water annually from Drift Creek, which is a tributary of the Pudding River. At issue, among other things, was a potential conflict between the proposed reservoir and an existing instream water right in Drift Creek, which has the purpose of "[p]roviding required stream flows for cutthroat trout for migration, spawning, egg incubation, fry emergence, and juvenile rearing." Although the proposed use—storage of water—would not "injure" the existing water right, the commission determined that the inundation of a portion of the creek to allow storage of water would frustrate the beneficial purpose of the existing right. The commission concluded that, "under ORS 537.170(8)(f) the proposed use will impair or be detrimental to the public interest and so the public interest presumption is overcome." It rejected the application "because, on this record, there are no modifications that will allow the proposed use to comport with the public interest to allow for approval." In other words, the commission determined that the application for the new water storage right conflicted with the purpose of the existing instream water right and therefore the application had to be denied.

Before us, the district raises seven assignments of error, contending that we should reverse the final order because it exceeded the commission's delegated authority, is legally erroneous, and is not supported by substantial evidence and reason. The district also requests that we remand to the commission with directions to issue a final order and water storage permit to the district that is consistent with the terms of the Oregon Water Resources Department Director's final order, which had approved the permit with conditions. Respondents Oregon Water Resources Department (department) and the commission contend that the commission did not err as alleged by the district.[1]

---

[1] The commission and the department filed a joint brief and we refer to them collectively herein as the state.

Respondent WaterWatch of Oregon (WaterWatch) agrees with the commission's denial of the district's application; however, it disagrees with the commission's determination that the proposed permit would not "injure" existing water rights and raises a cross-assignment of error. As we explain, we affirm.[2]

We are presented both with questions of law and questions of fact. On questions of law, we review for errors of law. ORS 183.482(8)(a). On questions of fact, we review for whether the findings in the commission's order are supported by substantial evidence. ORS 183.482(8)(c).

## I.   BACKGROUND

A.   *Regulatory Framework*

Under ORS 537.110, "[a]ll water within the state from all sources of water supply belongs to the public." "Subject to existing rights, *** all waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act." ORS 537.120. "[A]ny person intending to acquire the right to the beneficial use of any of the surface waters of this state shall, before beginning construction *** or performing any work in connection with the construction, or proposed appropriation, make an application to the Water Resources Department for a permit to make the appropriation." ORS 537.130; *see* ORS 537.140 (describing information to be provided in application for permit). If the "application is complete and not defective," and the proposed use is not prohibited by ORS Chapter 538, "the department shall undertake an initial review of the application" and "notify the applicant of its preliminary determinations." ORS 537.150(3) - (5). The department must also give public notice of the application that includes "a request for comments on the application." ORS 537.150(6).

ORS 537.153 contains requirements for the department's review of the application and issuance of a proposed final order. ORS 537.153(2) provides,

---

[2] Based on our disposition of the district's assignments of error, we need not reach WaterWatch's cross-assignment.

"In reviewing the application * * *, the department shall presume that a proposed use will not impair or be detrimental to the public interest if the proposed use is allowed in the applicable basin program established pursuant to ORS 536.300 and 536.340 or given a preference under ORS 536.310(12), if water is available, if the proposed use will not injure other water rights and if the proposed use complies with rules of the Water Resources Commission. This shall be a rebuttable presumption and may be overcome by a preponderance of evidence that either:

"(a)   One or more of the criteria for establishing the presumption are not satisfied; or

"(b)   The proposed use will impair or be detrimental to the public interest as demonstrated in comments, in a protest under subsection (6) of this section or in a finding of the department that shows:

"(A)   The specific public interest under ORS 537.170(8) that would be impaired or detrimentally affected; and

"(B)   Specifically how the identified public interest would be impaired or detrimentally affected."

That is, there is a rebuttable presumption that the proposed use is in the public interest. The presumption can be overcome if one or more of the criteria in subsection (2) are not satisfied or if a preponderance of the evidence shows that the proposed use will impair or be detrimental to one of seven statutory public interest factors in ORS 537.170(8). The proposed final order must "cite findings of fact and conclusions of law" and shall include "[w]hether the rebuttable presumption that the proposed use will not impair or be detrimental to the public interest has been established." ORS 537.153(3)(g).

If the presumption is rebutted, an application can still be approved if the director determines that it would not impair or be detrimental to the public interest. ORS 537.170(8) provides:

"If the presumption of public interest under ORS 537.153(2) is overcome, then before issuing a final order, the director or the commission, if applicable, shall make the final determination of whether the proposed use or the proposed use as modified in the proposed final order

would impair or be detrimental to the public interest by considering:

"(a)  Conserving the highest use of the water for all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing and wildlife, fire protection, mining, industrial purposes, navigation, scenic attraction or any other beneficial use to which the water may be applied for which it may have a special value to the public.

"(b)  The maximum economic development of the waters involved.

"(c)  The control of the waters of this state for all beneficial purposes, including drainage, sanitation and flood control.

"(d)  The amount of waters available for appropriation for beneficial use.

"(e)  The prevention of wasteful, uneconomic, impracticable or unreasonable use of the waters involved.

"(f)  All vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights.

"(g)  The state water resources policy * * *."

If a proposed use would "impair or be detrimental to the public interest, the director shall issue a final order rejecting the application or modifying the proposed final order to conform to the public interest." ORS 537.170(6). If the "director determines that the proposed use would not impair or be detrimental to the public interest, the director shall issue a final order approving the application or otherwise modifying the proposed final order." *Id.*

Within 20 days after the director issues a final order after a contested hearing, any party may file exceptions to the order with the commission. ORS 537.173(1). The commission "shall issue a modified order, if allowed, or deny the exceptions within 60 days after the close of the exception period." ORS 537.173(2).

B.   *Procedural and Substantive Facts*

The background and procedural facts are undisputed unless otherwise specified. In 2000, a group of Willamette Valley farmers, who were looking for additional water sources to irrigate their crops, organized themselves into an irrigation district under ORS 545.025. The district's boundaries are in Marion County and its purpose is to develop a secure source of future agricultural water for its members. In February 2013, the district filed a water storage application with the department.

The application requested a permit to build a dam and reservoir to store, each year from October 1 to April 30, 12,000 acre-feet of water from Drift Creek and unnamed tributaries of Drift Creek.[3] The reservoir would be built on-channel—in Drift Creek's streambed. The proposed height of the dam is approximately 70 feet above the streambed or ground surface at the center of the dam's crest. The area submerged by the reservoir when full would be approximately 384 acres. The application does not require the applicant to provide many details about the container or reservoir in which water will be stored, explain how the water will be conveyed, specify the amount of water it will release from the reservoir on a monthly or yearly basis, or explain how the project will be financed.[4] *See* ORS 537.140(1). Although the application asks for it, the district did not provide information about the proposed dam's composition, the locations and dimensions of its outlet conduits, or its emergency spillway. The district responded that, "because it is a water district, such plans and specifications are not required before the Department issues a permit."

The application is limited to a storage permit, which would only allow the district to store water. The district would need to obtain another water permit from the department to use the water. The district would also need to obtain authority from various state agencies, local agencies, and federal agencies to build the dam and reservoir, construct a

---

[3] Drift Creek is part of the Willamette River Basin, which only allows storage of surface waters from November 1 to April 30. The department advised the district that its requested storage season would be modified.

[4] The district estimates the total cost of the project to be $84 million.

method to convey the water, and use the water.[5] Before the dam could be constructed, its plans and specifications would have to be approved by the department's Dam Safety Office; the dam would also have to be approved by the federal Army Corps of Engineers. The district indicated in its application that it did not own the land from which the storage water would be diverted and transported; nor did it have written authorization or easements permitting access to that land.

As of the date of the district's application, there were two existing water rights on Drift Creek in the projected footprint of the reservoir. The water right pertinent to this petition for review is an instream water right reflected in Certificate number 72591 issued by the department in 1996, which has a priority date of October 18, 1990. The instream right was created pursuant to the Instream Water Act of 1987, under which public agencies, such as the Oregon Department of Fish and Wildlife (ODFW), may apply for water rights certificates for instream flows to benefit fish habitat, pollution abatement, or scenic attraction uses. The right in Certificate 72591 allows for specified monthly amounts of water flow, in cubic feet per second, to be maintained in Drift Creek from river mile 11, which is above the proposed dam and reservoir site, to Drift Creek's mouth, which is below the site. There are several conditions that apply to the use of water under the certificate, including that "[t]he flows are to be measured at the lower end of the stream reach to protect necessary flows throughout the reach." The certificate states that its "[p]urpose and/or use" is "[p]roviding required stream flows for cutthroat trout for migration, spawning, egg incubation, fry emergence, and juvenile rearing."

In July 2014, the department issued a proposed final order in which it proposed to approve the application and issue a water storage permit to the district. In September 2014, certain individuals, referred to collectively as the Rue protestants, and WaterWatch, filed protests to

_____

[5] Those agencies could include the Oregon Department of Environmental Quality, the Oregon Department of Fish and Wildlife, the Department of State Lands—which will require a wetlands mitigation permit—the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service.

the proposed final order.[6] The Rue protestants all own or lease land that would be inundated by the proposed reservoir and dam; they would not benefit from the project, in that the stored water would not be used by them for irrigation. They asserted that the public interest would not be served by issuance of the requested permit.[7] WaterWatch describes itself as a "nonprofit membership organization dedicated to promoting water allocation decisions in Oregon that provide the quality and quantity of water necessary to support fish, wildlife, recreation, biological diversity, ecological values, public health and a sound economy." WaterWatch asserted, among other things, several reasons why it believed that the proposed use would impair or be detrimental to the public interest.

In November 2016, the department requested that the Office of Administrative Hearings conduct a contested case hearing regarding the proposed final order, and an administrative law judge (ALJ) was assigned to the matter. A hearing was held June 18-29, 2018; written testimony was offered by three of the parties prior to the hearing, and numerous witnesses testified at the hearing.[8] The record was closed on September 12, 2018, after the parties submitted closing briefs. The ALJ issued a proposed order in February 2019, and the parties filed exceptions.

After reviewing those exceptions, the director of the department issued a final order dated September 13, 2019, which affirmed the proposed final order issued in July 2014, with certain conditions.[9] The director concluded as a matter of law, as relevant here, that "a presumption was established under ORS 537.153(2) that the proposed use will not impair or be detrimental to the public interest" and that the "[p]rotestants did not demonstrate under ORS 537.170(8) that the proposed use will impair or be detrimental to the

---

[6] The Rue protestants do not appear on judicial review.

[7] We do not provide details of the Rue protestants' concerns and specific protests to the proposed final order as those details are not necessary to explain our decision.

[8] The parties to the hearing were the department, the district, the Rue protestants, and WaterWatch.

[9] The director's final order is 148 pages in length and contains numerous factual findings.

public interest." WaterWatch and the Rue protestants timely filed with the commission exceptions to the director's final order in accordance with ORS 537.173(1).

At a public meeting of the commission on November 21, 2019, a subcommittee of commissioners, which had been created by the commission to review exceptions to the director's final order, made recommendations to the full commission. The full commission allowed oral argument the following day, deliberated on the disposition of the exceptions, and voted unanimously to issue a final order that was consistent with the subcommittee's recommendations. The commission issued a final order dated November 25, 2019.

The commission adopted and incorporated by reference, without any modifications, all of the findings of fact from the director's final order. It made three ultimate findings of fact: (1) "[i]n-stream water right 72591 is a certificated right on Drift Creek with a priority date of October 18, 1990, that provides for specified monthly amounts of water to flow from river mile 11 to the mouth of Drift Creek," (2) "[t]he beneficial purpose of Certificate 72591 is to provide required stream flows as stated on the face of the water right for cutthroat trout migration, spawning, egg incubation, fry emergence and juvenile rearing," and (3) "[t]he proposed appropriation would inundate a portion of the reach protected by Certificate 72591." The commission concluded as a matter of law that the "record establishes that under ORS 537.170(8)(f) the proposed use will impair or be detrimental to the public interest and so the public interest presumption is overcome" and that the "application must be rejected because, on this record, there are no modifications that will allow the proposed use to comport with the public interest to allow for approval."

In its analysis, the commission explained that in the exceptions filed by protestants, they had argued that the proposed use would not protect Certificate 72591 "because the in-stream water right requires that the protected flows be maintained throughout the 11-mile reach of the in-stream water right, as opposed to only being protected at the mouth of Drift Creek." The protestants had also argued that "the conditions in the Director's Final Order do not address all of

the expected impacts of the proposed use because the conditions do not 'make up for' the inundation of Drift Creek within the reservoir footprint." And because the director's final order did not fully address the impacts of inundation, the protestants asserted that the proposed appropriation will not protect the instream water right.

The commission explained that the protestants had raised the issue of inundation, in part, in the context of their argument that the proposed use would injure the existing water right, ORS 537.153(2). However, the commission noted that the department had defined "the term 'injury' to mean that an existing water right would not receive previously available water to which it is legally entitled"—a quantitative protection—and that the arguments of the protestants did not focus on that aspect.[10] Rather, according to the commission, the protestants' arguments addressed "competing types of uses presented by a proposed new appropriation that inundates an in-stream water right so as to frustrate the beneficial purpose of the existing vested right." In sum, the commission determined under ORS 537.153(2)(b)(A) that the presumption that the proposed use, *i.e.*, storage of water in a reservoir, would not impair or be detrimental to the public interest was overcome when considering the specific public interest factor in ORS 537.170(8)(f): "[a]ll vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights."

The district petitions for judicial review and seeks reversal and remand of the commission's order.

## II.  ANALYSIS

In its first assignment of error, the district asserts that the commission erred or acted outside the range of discretion delegated to it by law by denying the application based on a perceived deficiency in the director's final order that was not specifically raised in the exceptions filed by the protestants. Respondents contend that the issue was sufficiently raised for the commission to consider it. We

---

[10] The commission confirmed the treatment of "injury" in the director's final order.

agree with respondents and reject that assignment without discussion.

The district combines its argument for its second, third, and fourth assignments of error and we address them in that manner. In its second assignment of error, the district asserts that the commission erred in denying the district's application based on an erroneous interpretation of ORS 537.170(8)(f). In its third assignment of error, the district asserts that the commission erred in denying the application due to its erroneous interpretation of Certificate 72591 and the statutes governing instream water rights. In its fourth assignment of error, the district asserts that the commission erred in denying the application based on its erroneous conclusion that ORS 537.170(8) requires consideration of only a single public interest factor to determine whether the proposed use would impair or be detrimental to the public interest. Respondents argue that the commission did not err in the ways asserted by the district.

To the extent those assignments, or portions thereof, present a question of statutory interpretation, we apply our familiar methodology, considering the text, context of the relevant statutes, and any relevant legislative history that we deem helpful. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

The commission's order states, in part:

"In light of the arguments that the proposed appropriation, as currently conditioned, does not protect the portions of the in-stream water right that would be inundated by the proposed appropriation, the Commission examines the public interest factor in ORS 537.170(8)(f), which requires consideration of:

"'All vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights.'

"The direction to assure that new appropriations protect vested rights in water is consistent with other provisions of the Water Rights Act that require the Commission to determine, in addition to its injury determination, whether a new appropriation will 'take away,' 'impair,' or 'conflict' with existing vested rights.

"For example, ORS 537.120 states:

"'Subject to existing rights * * * all waters within the state may be appropriated for beneficial use as provided in the Water Rights Act and not otherwise; but nothing contained in the Water Rights Act shall be so construed as to take away or impair the vested right of any person to any water or to the use of any water.'

"In addition, ORS 537.160(1) states that the Department 'shall approve all applications made in proper form which contemplate the application of water to a beneficial use, unless the proposed use conflicts with existing rights.'

"Taken as a regulatory whole, in considering all vested rights to the waters of this state and the means necessary to protect such rights, the Commission must identify the attributes of existing vested water rights affected by the new appropriation and then examine whether there are the means necessary to protect those attributes. The elements of a water right that merit protection include not just the rate and the priority date, but also the beneficial purpose to which the water will be applied. Given this, we examine whether the in-stream water right is a vested right that merits protection, and if so, whether the Director's Order provides conditions that adequately protect the in-stream water right."

(Footnotes omitted.) The commission referred to a Supreme Court decision in which the court described the elements of a water right as part of the basis for its analysis. In *Fort Vannoy Irrigation v. Water Resources Comm.*, 345 Or 56, 79, 188 P3d 277 (2008), the court stated:

"The elements of an appropriation of water * * * are: (a) Quantity of water appropriated; (b) time, period, or season when the right to the use exists; (c) the place upon the stream at which the right of diversion attaches; (d) the nature of the use or the purpose to which the right of use applies, such as irrigation, domestic use, culinary use, commercial use, or otherwise; (e) the place where the right of use may be applied; [and] (f) the priority date of appropriation or right as related to other rights and priorities."

(Internal quotation marks omitted.) From that, the commission concluded that it was appropriate to consider the

purpose of the water right reflected in Certificate 72591, and not just the quantity of water as specified in the certificate.

The district takes the position that the commission misinterpreted ORS 537.170(8)(f). In its view, the commission should have limited its public interest evaluation to whether the proposed reservoir and dam would prevent Drift Creek from having a specific quantity of flow *at the mouth of the stream* and should not have considered the purpose or use of the water right contained in Certificate 72591. In support of that contention, the district argues that the commission ignored binding precedent, unnecessarily and incorrectly complicated its analysis by relying on and misconstruing ORS 537.120 and ORS 537.160(1), and "misapprehended the scope of protection afforded to a vested water right under Oregon law and misconstrued the terms of Certificate 72591."

The district relies on *Benz v. Water Resources Commission*, 94 Or App 73, 764 P2d 594 (1988) for the proposition that where a proposed permit would allow use of unappropriated water consistent with Oregon's prior appropriation system, existing vested rights are sufficiently protected. In that case, the commission had considered two criteria in what is now ORS 537.170(8) and the concern raised was the quantity of water available and whether water would be available for a junior right.[11] We stated that "[a] junior appropriator's water right cannot be exercised until the senior appropriator's right has been satisfied." *Id.* at 81. However, in *Benz*, we did not consider all of the possible applications of criterion (f), and did not address a situation like the one before us now, in which the commission held that the proposed new use would conflict with the *beneficial use* of an existing right, as opposed to just the amount of water available. *Benz* is not directly on point, nor controlling on the issue before us.[12]

___

[11] At the time of that decision, the factors were contained in ORS 537.170(5), but the statute has since been amended. *See former* ORS 537.170(5) (1985).

[12] We note that for some types of water use, such as irrigation, it makes sense to consider the quantity of water that is available when determining whether a water right is protected. However, not all water uses are consumptive. *See* ORS 537.170(8)(a) (referring to "highest use of the water for all purposes" including navigation, scenic attraction, and game fishing).

Next, the district contends that the commission incorrectly relied on and misconstrued ORS 537.120 and ORS 537.160(1) in its analysis. The district argues that ORS 537.120 and ORS 537.160(1) are not referenced or incorporated into the public interest analysis required under ORS 537.170(8) and that they do not require the commission to "identify the attributes of existing vested water rights affected by the new appropriation and then examine whether there are the means necessary to protect those attributes." The district interprets the commission's order as the commission stating that those statutes created an additional requirement to the public interest analysis.

We do not understand the commission's order the same way as the district does. As noted above, it is proper to consider related statutes for context when construing the meaning of a statute. In our view, the commission was undertaking its obligation to consider the protection of existing rights within the broader statutory scheme to assure that it was applying ORS 537.170(8)(f) consistently with related statutes. It was considering those statutes for context, which was proper for it to do.

The district also argues that the commission's analysis drastically expands the scope of rights protected by an instream water right beyond that protected by Oregon law. ORS 537.332 contains definitions regarding the statutes pertaining to instream water rights. That statute states, in part:

"As used in ORS 537.332 to 537.360:

"(1) 'In-stream' means within the natural stream channel or lake bed or place where water naturally flows or occurs.

"(2) 'In-stream flow' means the minimum quantity of water necessary to support the public use requested by an agency.

"(3) 'In-stream water right' means a water right held in trust by the Water Resources Department for the benefit of the people of the State of Oregon to maintain water in-stream for public use. An in-stream water right does not require a diversion or any other means of physical control over the water.

"(4)   'Public benefit' means a benefit that accrues to the public at large rather than to a person, a small group of persons or to a private enterprise.

"(5)   'Public use' includes but is not limited to:

"* * * * *

"(b)   Conservation, maintenance and enhancement of aquatic and fish life, wildlife, fish and wildlife habitat and any other ecological values[.]"

ORS 537.332. Under ORS 537.336(1), ODFW may request a water right certificate "for in-stream water rights on the waters of this state in which there are public uses relating to the conservation, maintenance and enhancement of aquatic and fish life, wildlife and fish and wildlife habitat" and that request "shall be for the quantity of water necessary to support those public uses as recommended by the State Department of Fish and Wildlife." The district argues that an instream water right merely guarantees that the required minimum flows are left instream—and does not entitle the holder to a particular velocity of stream flow, particular stream characteristics, a particular stream channel, or otherwise favorable habitat conditions for fish and wildlife. And as stated above, the district's position is that as long as the flow measured at the lower end meets the flow designated in the certificate, the water right is protected.

WaterWatch argues in response that the right to be protected by statute is not simply the right to a minimum quantity of water at a certain point on the creek. The state similarly argues that the water right certificate protects flows from river mile 0 at the confluence of the Pudding River up to river mile 11, and although the flow is to be measured at the lower end of the stream reach, that is to be done, according to the certificate, "to protect necessary flows *throughout the reach.*" (Emphasis added.)

We agree with respondents that the commission did not err in its construction of the relevant statutes or of the certificate. The water right is for the benefit of Oregonians "to maintain water in-stream for public use." ORS 537.332(3). And "public use" here, is "[c]onservation, maintenance and

enhancement of aquatic and fish life, \*\*\*, [and] fish and wildlife habitat." ORS 537.332(5)(b). The certificate requires "stream flows for cutthroat trout for migration, spawning, egg incubation, fry emergence, and juvenile rearing." ORS 537.170(8)(f) requires the commission to consider "[a]ll vested and inchoate rights to the waters of this state *or to the use of the waters* of this state, and the means necessary to protect such rights." (Emphasis added.)

Reading all of those statutory provisions together and taking into consideration the language of the certificate itself, we think it unlikely that the legislature intended that a junior water right would be permitted to frustrate the actual purpose and use of a senior water right. Multiple statutes refer to the use of the waters—not just the quantity. Therefore, we conclude that the commission did not err.

The district also asserts that the commission erred by incorrectly interpreting ORS 537.170(8) by failing to consider all of the public interest factors listed in subsections (a) through (f) and relying only on factor (f). It argues that the commission should have considered all seven factors with and against one another, whether the proposed use would impair or be detrimental to the public interest as a whole. We disagree with the district.

ORS 537.153(2) provides that the rebuttable presumption that a proposed use will not impair or be detrimental to the public interest can be overcome by a preponderance of evidence showing that

"(b)   The proposed use will impair or be detrimental to the public interest as demonstrated in comments, in a protest under subsection (6) of this section or in a finding of the department that shows:

"(A)   The specific public interest under ORS 537.170(8) that would be impaired or detrimentally affected; and

"(B)   Specifically how the identified public interest would be impaired or detrimentally affected."

That provision requires the commission to identify *the specific public interest* that would be impaired or detrimentally affected and to explain how *the identified public interest* would be affected. The legislature used the word "the"

with the singular word "interest." A plain reading of that statutory requirement is that only one factor needs to be identified and explained. The commission was permitted to rely on a single factor to decide that the presumption was overcome.[13]

In its fifth assignment of error, the district asserts that the commission improperly shifted the burden of proof to the district to demonstrate an absence of impairment or detriment of the public interest, contrary to ORS 537.153(2). The district bases its contention on a phrase in one of the conclusions reached by the commission:

> "If a portion of the reach is inundated to allow storage of up to 12,000 acre feet of water, *and absent evidence to the contrary*, the Commission concludes that the beneficial purpose of the flows to support the life stages of cutthroat trout is frustrated and the application for the new storage right conflicts with an existing in-stream water right."

(Emphasis added.) The state and WaterWatch argue that the commission did not improperly shift the burden.

We agree with respondents that the commission did not improperly shift the burden of proof. ORS 537.153 creates a rebuttable presumption that a proposed use is in the public interest *if* certain conditions are met; however, under paragraph (2)(b) of that statute, the presumption does not apply here, where the commission determined that the proposed use will impair or be detrimental to the public interest. The presumption was overcome. Once the presumption was overcome, it was the district's burden to prove that the reservoir would not impair or be detrimental to the public interest and that its application should be granted.

---

[13] Respondents point out that the commission cited OAR 690-310-0120(5) in its final order. That rule states,

> "If the Department finds that under section (4) of this rule the presumption is overcome, the Department shall issue a final order in accordance with OAR 690-310-0190 denying the application unless the Department makes specific findings to demonstrate that considering all of the public interest factors listed in ORS 537.170(8) the issuance of a permit will not impair or be detrimental to the public interest."

That is, if the commission were going to *grant* an application after determining that the presumption had been overcome, it would be required to consider all of the public interest factors.

In its sixth assignment of error, the district contends that the commission's findings and conclusions that the beneficial purpose of the instream water right will be "frustrated" by the issuance of the water storage permit are not supported by substantial reason. Agencies are "required to demonstrate in their opinions the reasoning that leads the agency from the facts that it has found to the conclusions that it draws from those facts." *Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996) (emphases omitted). Here, the district argues that there is no connection between the fact that the district would store 12,000 acre-feet of water annually in an on-channel reservoir and the conclusion that the minimum amounts required to be measured at the lower end of the reach will not be maintained. That argument is premised on its assertion that the commission erred by not basing its public interest analysis on the quantity of water to be measured at the lower end of the stream below the proposed dam. As discussed above, we rejected that argument. We likewise reject this assignment of error.

In its seventh assignment of error, the district asserts that substantial evidence in the record does not demonstrate that the use proposed by the application would impair or be detrimental to the public interest by somehow failing to support the life stages of cutthroat trout. Under ORS 183.482(8)(c), we must set aside or remand the order if we find that "the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." "Our review for substantial evidence does not entail or permit [us] to reweigh or to assess the credibility of the evidence that was presented to the factfinding body. As part of our substantial evidence review, we [also] look at whether the findings provide substantial reason to support the legal conclusion reached by the agency." *WaterWatch of Oregon v. Water Resources Dept.*, 324 Or App 362, 384, 527 P3d 1, *rev den*, 371 Or 332 (2023) (citations and internal quotation marks omitted; second brackets in original).

The district argues that the commission's factual conclusion that the use proposed by the application—an

instream reservoir that would inundate the creek—would frustrate the protection of flows to support the life stages of cutthroat trout is not supported by substantial evidence in the record. The district then points to certain findings that had been made in the director's final order, which were adopted by the commission: (1) Drift Creek's "temperature from mid-June to September is too warm for salmon and trout rearing and migration," and (2) "Drift Creek's water temperature is too warm because of hot weather, reduced summer water flow, and a lack of trees and other vegetation to shade the creek water." The district also points to testimony from its expert that reflected his opinion that the proposed reservoir had the potential to mitigate the primary factor limiting trout-rearing capacity, *i.e.*, decrease the water temperature, and improve habitat for cutthroat trout. The district then asserts that the commission's "conclusion that the proposed reservoir would be detrimental to the public interest cannot be reconciled with the [c]ommission's own factual finding that Drift Creek currently *does not support* key life stages of cutthroat trout during summer months." (Emphasis in original.) The district's argument focuses on certain findings made regarding the limited capacity of Drift Creek in the summer months. Notably, the district does not assign error to any of the findings contained in the commission's final order and does not assert that there is a *lack* of evidence in the record to support the commission's findings and conclusions that inundation of a portion of the creek that is protected by the instream water right will frustrate the beneficial purpose of the flows to support the life stages of cutthroat trout.

The state and WaterWatch both argue that substantial evidence in the record supports the conclusion that inundation of a portion of the 11-mile reach of Drift Creek will defeat the stated purpose of the instream water right.

The director's findings, adopted by the commission, include the following:

- "The following fish have been observed in Drift Creek or are reasonably expected to spawn or rear in the creek: *** Cutthroat Trout ***."

- "There are at least two non-listed fish present in Drift Creek. These include Cutthroat Trout and Coho Salmon. These two species may be impacted by the proposed use."[14]

- "Cutthroat Trout and Coho Salmon are members of the Salmonid family that live in Drift Creek for portions of their lives. Cutthroat Trout and Coho Salmon spawn and rear in Drift Creek."

- "*** Drift Creek's water quality is impacted by a low content of dissolved oxygen. Fish need dissolved oxygen to survive."

- "Four months after recommending to the Department that it approve [the district's] application with conditions, Mr. Murtagh [(the district fish biologist for ODFW)] made the following comments in an email message to a colleague at ODWF:

  '… [B]ased on the stream miles lost due to inundation, I remain very skeptical that they will be able to provide us with appropriate mitigation even if they provide passage as they are going to inundate most of the flowing stretch of stream with the 400-acre reservoir.

  '…[C]an we as an agency simply "not support" this project as planned even if they provide mitigation through the waiver process? I think we really stand to lose too much here in terms of function, connectivity, fish and wildlife values etc.' "[15]

In addition to those findings, there was evidence that cutthroat trout had been observed in Drift Creek in the summer months, contrary to the implication in findings relied on by the district. There is an area above the dam site that provides summer cold water refugia and where upstream migration is not blocked by waterfalls or dams. Trout and salmon from lower elevations in the watershed are likely to move into those cool water zones during the hottest part of the summer. There was testimony by Murtagh that

[14] "Non-listed" refers to fish that are not listed as sensitive, threatened, or endangered fish species.

[15] Murtagh never withdrew ODFW's recommendation that the Department grant the district's application with conditions.

cutthroat trout, and other fish, need running water habitats with clean gravel beds for spawning and may need a functioning watershed that provides a rearing area to live in for a period of time. Murtagh explained that cutthroat trout are fluvial migrating fish; they spend part of their life cycle in the lower trunks of rivers, including lower Drift Creek, and in the winter and early spring, move up in order to spawn. Murtagh was concerned about inundation, as expressed in his email above, and testified that if there was no fish passage as part of the dam, seven to ten linear miles of stream would be lost as habitat.[16]

There was testimony that although Drift Creek has degraded habitat, there are some pockets of habitat above the proposed dam site that look to be suitable for the reproduction of native salmonids. Mr. Gowell, a fellowship director with the Native Fish Society, testified that although fish passage is the impact most focused on when looking at impacts to fish from a dam, there are other impacts, such as getting juvenile fish downstream; because of the lack of flow associated with reservoirs, the fish tend to get lost and cannot find the outlet to them. In addition, there can be severe water quality impacts including water temperature modifications, dissolved oxygen, and nutrient changes. Gowell also testified that the transport of sediments and bedload is inhibited; "the flow of a stream typically carries rock, sediment, and other debris downstream, like woody debris or leaf litter; and when you impound water, those sediment and bedload transport processes end up in the bottom of the reservoir instead of being carried downstream into * * * the waterway." Gowell explained that those natural processes are what fish have adapted to living with and depend on to complete their life cycles. Gregory Apke, the statewide fish passage program coordinator for ODFW, testified that he is familiar with the stretch of stream that would be upstream from the proposed dam and that there is habitat for native migratory fish up there.[17] Apke also testified that

---

[16] ODFW's fish passage coordinator testified that it was his understanding that the district planned to seek a waiver of the fish passage requirements rather than build a fish passage structure.

[17] Apke testified that cutthroat trout are native migratory fish.

"[r]eservoirs can be problematic for fish migrating upstream and downstream."

We conclude that there is substantial evidence in the record upon which a reasonable person could find that the proposed reservoir and resulting inundation of the creek would conflict with the habitat needs of cutthroat trout, and the beneficial purpose of the instream water right would be frustrated. For that reason and the additional reasons expressed above, we affirm the commission's final order.

Affirmed.