148 August 7, 2025 No. 34

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of Water Right Application R-87871

in the Name of

EAST VALLEY WATER DISTRICT,
*Petitioner on Review,*

*v.*

OREGON WATER RESOURCES COMMISSION,
Oregon Water Resources Department,

*and*

WATERWATCH OF OREGON, INC.,
*Respondents on Review,*

*and*

Joel RUE
et al.,
*Protestants below.*
(R87871) (CA A173292) (SC S070604)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 7, 2024.

Merissa A. Moeller, Stoel Rives LLP, Portland, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Kirk B. Maag, David E. Filippi, and Hayley K. Siltanen.

Denise G. Fjordbeck, Assistant Attorney General, Salem, argued the cause and filed the brief for respondents on review Oregon Water Resources Commission and Oregon Water Resources Department. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* On judicial review from a final order of the Oregon Water Resources Commission. 328 Or App 790, 539 P3d 789 (2023).

Thomas M. Christ, Sussman Shank LLP, Portland, argued the cause and filed the brief for respondent on review WaterWatch of Oregon. Also on the brief was Brian J. Posewitz, WaterWatch of Oregon, Portland.

Olivier Jamin, Davis Wright Tremaine, LLP, Portland, filed the brief for *amici curiae* Oregon Water Utility Council, League of Oregon Cities, and Special Districts Association of Oregon.

Steven L. Shropshire, Jordan Ramis P.C., Bend, Oregon, filed the brief for *amicus curiae* for Oregon Association of Nurseries. Also on the brief was Marika E. Sitz.

Josh Newton, Best Best & Krieger LLP, Bend, filed the brief for *amici curiae* The Confederated Tribes of the Warm Springs Reservation of Oregon, The Confederated Tribes and Bands of the Yakama Nation, the Confederated Tribes of the Umatilla Indian Reservation, and the Nez Perce Tribe. Also on the brief was Alison Toivola, Best Best & Krieger LLP, Bend; Marcus Shirzad, Yakama Nation Office of Legal Counsel, Toppenish, Washington; Joseph Pitt, CTUIR Office of Legal Counsel, Pendleton; and David Cummings, Nez Perce Tribe Legal Counsel, Lapwai, Idaho.

Andrew R. Missel, Advocates for the West, Portland, filed the brief for *amici curiae* Columbia Riverkeeper, Oregon Wild, and Northwest Environmental Defense Center.

DeHOOG, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The order of the Water Resources Commission is reversed, and the case is remanded to the Water Resources Commission for further proceedings.

Bushong, J., dissented and filed an opinion.

**DeHOOG, J.**

Oregon water law authorizes the granting of water rights, which, among other things, permit water-rights holders to acquire specific quantities of water to use for specific, beneficial purposes. A water right may not be granted if the new water right would injure a senior right holder's water right or if the proposed use of the water would be contrary to the public interest. In this case, the Oregon Water Resources Commission (commission)[1] denied petitioner East Valley Water District's (East Valley or district) application to store water in a reservoir that the district planned to create by building a dam within a creek's streambed. East Valley petitions this court to review a decision of the Court of Appeals affirming the commission's final order denying that application. In its final order, the commission concluded that East Valley's proposed storage of water from the creek would impair or be detrimental to the public interest under ORS 537.170(8)(f) because it would "frustrate the beneficial purpose" of an existing in-stream water right on the creek and would not provide the means necessary to protect that right. East Valley sought judicial review in the Court of Appeals, contending, among other things, that the commission had erred in protecting the beneficial purpose of the existing water right and not merely the quantity of water available to fulfill that right, but that court affirmed the commission's final order. *East Valley Water v. Water Resources Commission*, 328 Or App 790, 539 P3d 789 (2023). We allowed East Valley's petition for review, and, for the reasons that follow, we conclude that the beneficial purpose or use for which a water right has been granted is a protected public interest and that the commission did not err in considering that use in determining the public interest. We further conclude, however, that the commission erred in failing to consider all the statutorily required public interest factors in making its final determination regarding the

---

[1] The commission is a seven-member board of citizen appointees nominated by the Governor and confirmed by the Oregon Senate. ORS 536.022. Respondents in this case are the commission, the Oregon Water Resources Department (department), and WaterWatch of Oregon, Inc. (WaterWatch). We refer to the commission, the department, and WaterWatch collectively as "respondents" in this opinion except when discussing their individual actions and decisions.

public interest. We therefore affirm in part[2] and reverse in part the decision of the Court of Appeals, and we remand the case to the commission for further proceedings.

## I.   BACKGROUND

A.   *Brief Overview of the Dispute*

East Valley is an irrigation district established in 2000 by a collective of Willamette Valley farmers under ORS 545.025 (setting out process for formation of irrigation districts). East Valley's geographic boundaries are in Marion County and extend from north of Silverton to south of Woodburn and Molalla; the district is bordered by the Pudding River on the west and the Cascade Mountain foothills on the east. The district was created for the purpose of obtaining the permits necessary to construct and store water in a reservoir that would provide its members with a source of water for irrigation.

In February 2013, East Valley submitted a water storage application to the Oregon Water Resources Department (department).[3] The application sought approval for a reservoir that would store 12,000 acre-feet of water each year, from October 1 through April 30, for "irrigation, supplemental irrigation, and flow augmentation as may be required for the approval of this irrigation reservoir by [the department]." Construction on the project would begin within 10 years of a permit being issued. The reservoir would be created by constructing a dam on Drift Creek, a

---

[2] In the Court of Appeals, East Valley's first assignment of error asserted that the commission had acted outside the range of discretion delegated to it by law by denying its application based on a perceived deficiency in the director's final order that was not specifically raised in the exceptions filed by the protestants. The Court of Appeals rejected that argument without discussion, and East Valley does not renew it in this court. We therefore also affirm that part of Court of Appeals' decision.

[3] The district applied for a storage permit that would allow it only to store water. If that permit were granted, it would be merely the first step in the permitting process. Before beginning construction, East Valley would need to obtain approval of dam specifications from the department's Dam Safety Office. In addition, the dam would have to be approved by the federal Army Corps of Engineers, which, in turn, also requires certification from the federal Department of Environmental Quality. And before making use of the water, the district would have to obtain another permit from the department authorizing it to use the water for irrigation and other purposes. Separately, the district also would need to obtain permits from a variety of other local, state, and federal agencies.

tributary of the Pudding River. The proposed height of the dam would be approximately 70 feet above the streambed or ground surface at the center of the dam's crest. The area submerged by the reservoir when full would be approximately 384 acres. When full, the reservoir would inundate land presently belonging to other local farmers (referred to in these proceedings as the Rue Protestants), and, when it was not full, that land would be unusable mudflats. East Valley, as a water district, plans to take ownership of the land inundated by the reservoir through eminent domain.[4]

As we will explain in more detail below, the department issued a proposed final order in 2014 granting the district's application. The Rue Protestants and WaterWatch of Oregon[5] (together, the protestants) challenged the proposed final order,[6] and the matter was referred to a hearing before an administrative law judge (ALJ). In February 2019, the ALJ issued a proposed order recommending that the department approve the requested water permit with minor modifications. The protestants filed exceptions to the ALJ's proposed order, after which the director of the department issued a final order affirming the ALJ's proposed order. The protestants then filed exceptions to the director's final order with the commission, and, in November 2019, the commission issued its own final order reversing the director's final order and denying East Valley's application. East Valley petitioned for judicial review of the commission's final order, and the Court of Appeals affirmed. East Valley now challenges the commission's final order on review.

---

[4] Irrigation districts must own or have legal access to land directly impacted by a reservoir. ORS 537.400 (requiring showing that permittee owns or has written authorization or an easement permitting access to all lands inundated by a reservoir before reservoir permit is issued). Irrigation districts such as East Valley may acquire the inundated property through the exercise of eminent domain under ORS 545.239.

[5] WaterWatch identifies itself as a "nonprofit membership organization dedicated to promoting water allocation decisions in Oregon that provide the quality and quantity of water necessary to support fish, wildlife, recreation, biological diversity, ecological values, public health and a sound economy."

[6] The Rue Protestants oppose the project primarily because of its effect on their land. They argued below that monetary compensation through eminent domain would not fully compensate them for the loss of land that has been in their families for generations. WaterWatch opposes the project primarily because of its impact on fish habitat.

To understand the historical and procedural facts leading to the commission's final order and the basis for that order, it is helpful to start with an overview of Oregon's water law and the process for obtaining a permit to appropriate water, thereby establishing a new water right. Thus, we will briefly explain that statutory framework before turning to the facts of this case.

B.   *Statutory Framework*

1.   *Law concerning appropriation and allocation of water in Oregon*

Oregon's Water Rights Act, first enacted in 1909 as the Oregon Water Code, Or Laws 1909, chapter 216, governs how water in the state is appropriated and allocated. *See* ORS 537.010 (setting out the various statutes, across different chapters, that make up the Water Rights Act).[7] Under that act, "[a]ll water within the state from all sources of water supply belongs to the public." ORS 537.110. An individual or entity can acquire a water right by obtaining a permit to appropriate water for a "beneficial use" and complying with the provisions of the act. ORS 537.120. The term "beneficial use" is not specifically defined by statute, but qualifying beneficial uses include domestic use, municipal water supply, irrigation, power development, industrial use, mining, recreation, conservation of fish and wildlife, and pollution abatement. *See, e.g.*, ORS 536.300(1) (declaring those uses of water to be "beneficial uses"); ORS 537.170(8)(a) (identifying such uses as among the "highest use of the water"); ORS 537.625(3)(a) (requiring the commission to consider "conservation of the highest use" of water for those purposes in making a final determination whether a proposed use would preserve the public welfare); ORS 543.225(3)(a) (identifying

[7] Under the Water Rights Act, water rights appropriated for beneficial uses after the effective date of the act—February 24, 1909—are generally governed by ORS chapter 537, while rights to water that had been appropriated before that date were not superseded but were required to be determined through the process codified in ORS chapter 539. *See Klamath Irrigation District v. Water Res. Dept.*, 321 Or App 581, 584, 518 P3d 970 (2022) (describing the effect of the Water Rights Act); *Warner Valley Stock Co. v. Lynch*, 215 Or 523, 548, 336 P2d 884 (1959) (noting the division in Oregon law "between the procedure set out in Ch 539 for the determination of water rights initiated before the adoption of the water code on February 24, 1909, and the procedure incident to the granting, denying and cancellation of [water rights] permits after that date").

such uses as among the "highest use of the water"). The department's administrative rules provide their own definition of "beneficial use," defining it as "the reasonably efficient use of water without waste for a purpose consistent with the laws, rules and the best interests of the people of the state." OAR 690-077-0010(3).

Before appropriating water for beneficial use and constructing the necessary works, such as a dam and reservoir, an individual or entity must obtain a permit from the department. ORS 537.130(1). A permit application is subject to public interest review under ORS 537.153. Upon determining that a proposed appropriation is for a beneficial use and that the applicant has complied with the other provisions of the act, the department issues a water-right certificate. ORS 537.250(1). The right to the use of water as set out in the certificate continues in the owner of the certificate "so long as the water shall be applied to a beneficial use under and in accordance with the terms of the certificate." ORS 537.250(3)(a). However, the right is subject to loss by nonuse. *Id.*; ORS 540.610(1) (if the owner of a water right ceases or fails to use all or part of the appropriated water for five years, a rebuttable presumption of forfeiture of the right arises).

The Water Rights Act codifies the common-law doctrine of prior appropriation, in which the first person to apply water to a beneficial use acquires the "right" to use the appropriated water for that purpose.[8] *Teel Irrigation Dist. v. Water Res. Dept.*, 323 Or 663, 666-67, 919 P2d 1172 (1996); *see also Fort Vannoy Irrigation v. Water Res. Comm'n*, 345 Or 56, 64-66, 188 P3d 277 (2008) (discussing history of the appropriation doctrine and the Water Rights Act). Others may later acquire the right to use previously appropriated water, but a holder of a senior right—a right that was established earlier, giving it an earlier priority date—is entitled to receive water before the holder of a junior right may

---

[8] In *Fort Vannoy Irrigation v. Water Resources Comm.*, 345 Or 56, 64-66, 188 P3d 277 (2008), this court explained that, historically, Oregon water law embodied two doctrines that provided the bases for the right to use surface water. In addition to the doctrine of appropriation, Oregon law recognized the riparian doctrine, under which water rights were based on a party's ownership of land adjacent to a water source, rather than on the party's beneficial use of the water as with prior appropriation. *Id.* However, the court further explained, with the enactment of the Water Rights Act in 1909, the appropriation doctrine prevailed.

exercise its right. ORS 537.120 (providing that "all waters of the state" may be appropriated for beneficial use "[s]ubject to existing rights," and nothing in the act may be construed to "take away or impair the vested right of any person to any water or to the use of any water"); ORS 537.153(2) (in reviewing an application for a water right, the department must consider, among other things, whether the proposed use will injure other water rights); *Fort Vannoy*, 345 Or at 64-65 (explaining that, as early as the 1840s to 1850s, when questions arose concerning the right to use streams, Oregonians applied a "first in time, first in right" rule, under which the first person to divert water had a prior right to it to the extent of the diversion, for use on both riparian and nonriparian land); *McCall v. Porter*, 42 Or 49, 57, 70 P 820 (1902), *reh'g den*, 42 Or 49, 71 P 976 (1903) ("The waters of a natural stream are subject to successive appropriations, and, so long as the subsequent appropriators do not injure or impair the rights of those prior to them, they may use as much water as they choose.").

A water right may be consumptive, insofar as the water is diverted out of a stream and consumed—for example, water used for irrigation—or it may be an "in-stream" right, defined in ORS 537.332(3) as

> "a water right held in trust by the Water Resources Department for the benefit of the people of the State of Oregon to maintain water in-stream for public use. An in-stream water right does not require a diversion or any other means of physical control over the water."

In other words, in-stream rights are by definition not consumptive; their beneficial purpose derives from water remaining in the stream. Moreover, by maintaining water in-stream for public uses, in-stream rights benefit the public at large rather than a person, a small group of people, or a private enterprise. ORS 537.332(4) (so defining "public benefit"). "Public uses" under the statute include, among other things, "[c]onservation, maintenance and enhancement of aquatic and fish life, wildlife, fish and wildlife habitat and any other ecological values." ORS 537.332(5)(b). Public uses are "beneficial uses." ORS 537.334(1) (so stating). A certificate for an in-stream water right has the same legal status as any

other water right for which a certificate has been issued. ORS 537.350(1). That is, like any other certificated water right, a certificated in-stream right is vested,[9] and the attributes and priority date of an in-stream water right must be given the same protection as any other water right. *See Teel Irrigation Dist*, 323 Or at 668 ("The certificate represents a vested, perfected water right that continues so long as the water is applied to a beneficial use in accordance with the terms of the certificate, subject to loss by nonuse and other events.").

ORS 537.336 authorizes various state agencies to request in-stream water rights. Specifically, as relevant here, the Oregon Department of Fish and Wildlife (ODFW) is authorized to request the department to issue water-rights certificates on waters in the state "in which there are public uses relating to the conservation, maintenance and enhancement of aquatic and fish life, wildlife[,] and fish and wildlife habitat." ORS 537.336(1). A request for an in-stream water right "shall be for the quantity of water necessary to support those public uses as recommended by [ODFW]." *Id*. The minimum quantity of water necessary to support the public use requested is known as the "in-stream flow." ORS 537.332(2). Under ORS 537.341, the commission issues in-stream water-right certificates in the name of the department as trustee for the people of Oregon.

   2.  *Law concerning review of applications for water rights*

Under ORS 537.130, any person intending to acquire the right to the beneficial use of water in this state must apply to the department for a permit to make the appropriation. If the department determines (1) that the application is complete, (2) that the proposed use is not prohibited outright by statute, and (3) that there are no immediate legal or other barriers that may limit or preclude approval, then the department notifies the applicant of its preliminary determinations before undertaking an initial review of the application. ORS 537.150(2) - (5). Upon proceeding to that initial review, the department also must publish notice of, and request public comment on, the application. ORS 537.150(6).

---

[9] A "vested" water right is a final, perfected water right evidenced by a certificate. *Fort Vannoy*, 345 Or at 76.

In conducting its initial review of an application, the department must presume that the proposed use of the water will not impair or be detrimental to the public interest if four criteria are met: (1) the proposed use is permissible, (2) water is available; (3) the proposed use will not injure other water rights, and (4) the proposed use complies with the commission's rules. ORS 537.153(2). This is a rebuttable presumption, and it may be overcome by a preponderance of evidence showing either that one or more of the criteria for establishing the presumption is not in fact satisfied or that the proposed use will impair or be detrimental to the public interest. *Id*. The department then completes its review of the application and issues a proposed final order approving the application, approving it with or modifications or conditions, or denying the application altogether. ORS 537.153(1).

Any person may protest a proposed final order.[10] ORS 537.153(6). Within 60 days of the close of the period for receiving protests, the department director must either issue a final order as provided in ORS 537.170(6) or, if a protest has been filed and the director finds that there are significant disputes related to the proposed use of water, schedule a contested case hearing before an ALJ. ORS 537.153(8). The contested case proceeding generally is conducted in accordance with the provisions of ORS chapter 183 governing such proceedings. ORS 537.622(3). At the conclusion of the contested case proceeding, the ALJ issues a proposed order that includes recommended findings of fact and conclusions of law. ORS 183.470(2). Parties may file exceptions to the ALJ's proposed order. OAR 690-002-0175. After a contested case hearing, or, if a hearing is not held, after the close of the period for filing protests, the director issues a final order either approving or rejecting the application. ORS 537.170(6). Any person may file exceptions to the director's final order with the commission. ORS 537.173(1). The commission must then issue a modified order or an order denying the exceptions within 60 days of the close of the exception period. ORS 537.173(2). Any party affected by the commission's final order in a contested case may seek review of the order in the Court of Appeals. ORS 536.075(2).

---

[10] In addition, any person who supports a proposed final order may request standing for purposes of participating in any contested case proceeding on the proposed final order or for judicial review of a final order. ORS 537.153(5).

C.  *Historical Facts*

        With that legal framework in mind, we turn to the historical facts.[11] In 2013, East Valley filed a water storage application with the department, requesting a permit to build a dam and create a reservoir to store water from Drift Creek and some of its tributaries. In July 2014, the department issued a proposed final order recommending approval of East Valley's application with certain conditions. In arriving at that recommendation, the department first determined that East Valley was entitled to the rebuttable presumption under ORS 537.153(2) that its proposed water storage would not be detrimental to the public interest, because it found that (1) the proposed use was permissible; (2) water was available; (3) the proposed use would not injure other water rights; and (4) the proposed use complied with the commission's rules. The department then turned to consider whether the rebuttable presumption that the proposed use was in the public interest had been overcome. Under ORS 537.153(2)(b), one way in which that presumption can be overcome is by a preponderance of evidence indicating that the use would impair or detrimentally affect one or more of the seven public interest considerations set out in ORS 537.170(8),[12] including, among other things, "all vested and inchoate rights to the waters

_____

[11] We take the facts, which are undisputed, from the commission's factual findings, which, in turn, adopt and incorporate the factual findings set out in the director's final order.

[12] The seven public interest considerations set out in ORS 537.170(8) are as follows:

    "(a) Conserving the highest use of the water for all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing and wildlife, fire protection, mining, industrial purposes, navigation, scenic attraction or any other beneficial use to which the water may be applied for which it may have a special value to the public.

    "(b) The maximum economic development of the waters involved.

    "(c) The control of the waters of this state for all beneficial purposes, including drainage, sanitation and flood control.

    "(d) The amount of waters available for appropriation for beneficial use.

    "(e) The prevention of wasteful, uneconomic, impracticable or unreasonable use of the waters involved.

    "(f) All vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights.

    "(g) The state water resources policy formulated under ORS 536.295 to 536.350 and 537.505 to 537.534."

of this state or to the use of the waters of this state, and the means necessary to protect such rights." ORS 537.170(8)(f). Regarding that consideration, the department concluded that "[a]ll vested water rights are protected by their respective priority dates, the prior appropriation system, and the [d]epartment's regulatory procedures."[13]

In September 2014, the protestants filed protests to the department's proposed final order, and a contested case hearing was scheduled. The hearing took place in June 2018. In that proceeding, the protestants argued, among other things, that the proposed use would impair an existing water right: the right provided for in Certificate 72591.[14] In 1996, the commission had issued Certificate 72591, an in-stream water right issued for Drift Creek under ORS 537.341 for the purpose of "[p]roviding required stream flows for cutthroat trout for migration, spawning, egg incubation, fry emergence, and juvenile rearing." Certificate 72591 has a priority date of October 18, 1990, and it guarantees a specific in-stream flow and includes certain conditions, including condition 5, which provides, "The flows are to be measured at the lower end of the stream reach to protect necessary flows throughout the reach."[15] The protestants argued that inundating part of Drift Creek would impair or be detrimental to that in-stream water right because it would adversely affect the habitat and ability to spawn of various fish species that live in the creek, including cutthroat trout. Notwithstanding that objection, the ALJ issued a proposed order in February 2019 recommending that the department approve the requested permit, subject to minor modifications.

---

[13] The department also considered the other six public interest factors in ORS 537.170(8) and concluded that the presumption had not been overcome by a preponderance of evidence under any of the public interest factors.

[14] In addition to Certificate 72591, a second water right exists on Drift Creek within the projected footprint of the reservoir. Certificate 36095, known as the Schact water right, has a priority date of August 3, 1967, and is owned by one of the Rue Protestants. It permits storage of up to 3.4 acre-feet of water each year for a fishpond. The land on which the fishpond is located would be inundated by the East Valley reservoir and is part of the land that East Valley intends to acquire by eminent domain if its application is approved. The Schact water right is not at issue in this proceeding.

[15] The parties agree that the "lower end of the stream" means the mouth of Drift Creek, at the confluence with the Pudding River.

The protestants filed exceptions to that proposed order, and the director issued a final order affirming, with limited modifications, both the department's proposed final order and the ALJ's proposed order. In so doing, the director made findings of fact, which the commission later adopted in their entirety and incorporated by reference in its own final order.

Among other things, the director found—for purposes of determining whether, under ORS 537.153(2), the rebuttable presumption that the proposed storage of water would not be detrimental to the public interest applied—that (1) the proposed use was permissible; (2) water was available; (3) the proposed use would not injure other water rights; and (4) the proposed use complied with the commission's rules. With respect to the third factor—whether the proposed use would "injure" existing water rights, ORS 537.153(2)—the director noted that the commission had no administrative rule defining "injure" in the context of new water rights, but its practice was to construe that term as its rules defined it for purposes of proposed transfers of water rights. In that context, OAR 690-380-0100(3) provides that "'[i]njury' or '[i]njury to an existing water right' means a proposed transfer would result in another, existing water right not receiving previously available water to which it is legally entitled." Applying that definition of injury, the director found that the senior in-stream water right on Drift Creek—Certificate 72591—would not be injured by the proposed use, because the draft permit specifically provided that East Valley was permitted to use water "only at times when sufficient water is available to satisfy all prior rights." For the same reason, the director concluded that the protestants had not rebutted the presumption that the proposed use was in the public interest, because none of the public interest considerations set out in ORS 537.170(8) weighed against approval of the application. Importantly, as relevant here, the director concluded that the protestants had not shown by a preponderance of the evidence that the proposed use would impair or be detrimental to "vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights," ORS 537.170(8)(f), because the prior appropriation system worked to protect

the water rights that Certificate 72591 guaranteed: Under that system, East Valley would not be permitted to store water until all senior water rights were satisfied.

The protestants filed exceptions to the director's final order with the commission under ORS 537.173. They argued (1) that the proposed use would not protect the in-stream water rights within Drift Creek as guaranteed by Certificate 72591, because that certificate requires that the protected flows be maintained throughout the 11-mile reach of the in-stream water right and not merely at the mouth of Drift Creek, and (2) that the proposed new appropriation would inundate an in-stream water right and thereby frustrate the beneficial purpose of that existing vested right.

Agreeing with the protestants' second exception, the commission issued a final order reversing the director's order and rejecting East Valley's application, reasoning that the proposed use would impair or be detrimental to the public interest and that no modifications would allow the proposed use to comport with the public interest so as to allow for approval. As we will discuss in more detail below, the commission agreed with the director that East Valley was entitled to the presumption that the proposed use was in the public interest, based on findings that (1) the use was permissible, (2) water was available, (3) the proposed use would not injure other water rights, and (4) the proposed use complied with commission rules. The commission concluded, however, that the protestants had overcome that presumption by demonstrating, by a preponderance of the evidence, that East Valley's water storage project would frustrate the beneficial purpose of an existing water right—Certificate 72591—namely, to provide habitat for cutthroat trout. The commission then conducted the review that it understood ORS 537.170(8) to require under the circumstances, and it concluded that the seniority of the in-stream right would not alone protect the purpose of that right. The commission explained:

"Where an existing water right and a proposed new use are both diverted out of the stream for consumptive use, a senior priority date will protect the senior water right because a junior appropriator is prohibited from diverting water unless and until senior right water rights are

met. However, where a proposed reservoir will inundate a stream reach protected by an existing in-stream water right, additional scrutiny is required to determine whether there exist conditions that may provide the means necessary to protect the beneficial purpose of the in-stream water right."

Upon applying that additional scrutiny, the commission determined that inundation of Drift Creek would frustrate the beneficial purpose of the in-stream water rights conferred by Certificate 72591 and that the record did not establish that there existed the means necessary to protect those in-stream rights.[16] It therefore denied East Valley's application for a permit.

East Valley sought judicial review in the Court of Appeals, and, as noted, that court affirmed the commission's final order. *East Valley Water*, 328 Or App 790.

## II.   ANALYSIS

On review, East Valley contends that, in affirming the commission's final order, the Court of Appeals misinterpreted the applicable statutes in two ways. First, it argues, the Court of Appeals misinterpreted ORS 537.170(8)(f) —which requires consideration of all "vested and inchoate" water rights and "the means necessary to protect such rights"—as protecting something other than the senior water-right holder's entitlement to a certain quantity of water as measured at a certain location. According to East Valley, in expressly making that consideration part of the commission's assessment of whether a proposed use would be in the public interest, the legislature intended merely to codify the well-established principle of "prior appropriation" and thereby ensure that the certificated quantity of water is present at the measurement point identified in the certificate—in this case, at the mouth of Drift Creek. East Valley argues that the legislature did not intend ORS 537.170(8)(f)

---

[16] In so doing, the commission emphasized that it did not intend its decision in this case to suggest that, in all cases, inundation of an in-stream water right will frustrate the purpose of an existing in-stream water right. The commission stated that, in a different case, with a different in-stream water right and a different record, the commission may determine that conditions could be fashioned to protect existing in-stream water rights within the inundated area, and that, under those circumstances, the commission might well arrive at a different conclusion.

to permit the commission to consider anything other than water quantity—including whether the beneficial purpose of a senior water right would be frustrated by the proposed use—in determining whether the proposed use was in the public interest.

Second, and alternatively, East Valley argues that the Court of Appeals misinterpreted the requirements of ORS 537.153 and ORS 537.170(8) in denying its permit application. According to East Valley, once the rebuttable presumption of public interest has arisen, ORS 537.153 and ORS 537.170 require the commission to "consider" *all* of the public interest factors—and balance them against one another—to determine whether the presumption has been overcome. At a minimum, East Valley contends, the commission was required to consider all seven public interest factors before making its final determination under ORS 537.170(8) whether the proposed use was in the public interest. East Valley asserts that the commission relied on only one of the public interest factors—ORS 537.170(8)(f)—in reaching both decisions; it argues that, for that separate reason, the Court of Appeals erred in affirming the commission's order.

East Valley's first argument, and, in part, its second argument, present issues of statutory construction, which we resolve by applying the familiar methodology set out in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), through which we attempt to discern the intent of the legislature that enacted the statutory provisions at issue by considering their text and context, together with any legislative history that we find helpful.

We begin by observing that no party challenges the director's factual findings, which the commission's final order adopted and incorporated by reference in their entirety. Accordingly, we accept those findings of fact for purposes of this opinion. In addition, the parties do not challenge the commission's determination that, under ORS 537.153(2), the rebuttable presumption that the proposed use is in the public interest arose here.[17] As explained above, that determi-

---

[17] In the Court of Appeals, WaterWatch did challenge that determination, arguing that "injur[y]" to a water right within the meaning of ORS 537.153(2)

nation was based on the commission's findings, under ORS 537.153(2), that (1) the proposed use was permissible; (2) water was available; (3) the proposed use would not injure other water rights; and (4) the proposed use complied with the commission's rules. We therefore also accept, for purposes of this opinion, that the rebuttable presumption set out in ORS 537.153(2) applies. Doing so necessarily means that we assume, for purposes of this opinion, that a senior water-right holder is "injure[d]" within the meaning of ORS 537.153(2) only if the senior water-right holder would not receive the quantity of water to which it is legally entitled under a certificate.

A.   *The Public Interest Protected by ORS 537.170(8)(f)*

East Valley's statutory arguments both are ultimately directed at the commission's reliance on ORS 537.170(8)(f). As noted, East Valley first contends that the commission erroneously interpreted that paragraph as protecting the specific use underlying a water right, and not just the quantity of water to which a right holder is entitled. Second—and alternatively—East Valley argues that, to the extent that ORS 537.170(8)(f) does protect such uses, the commission erred in relying solely on that provision to support (1) its conclusion that the public interest presumption had been rebutted, (2) its final determination that East Valley's proposed use would impair or be detrimental to the public interest, or (3) both. We begin with East Valley's argument that ORS 537.170(8)(f) does not protect the use for which a water right has been granted.

The public interest reflected in ORS 537.170(8)(f) first comes into play through ORS 537.153(2), which, among other things, establishes the conditions that give rise to a rebuttable presumption that a proposed use is in the public interest and lists ways in which that presumption may be overcome. As relevant here, under ORS 537.153(2), the public interest presumption can be overcome by a preponderance of evidence that either:

---

means more than merely insufficient water to satisfy existing water rights. The Court of Appeals found it unnecessary to reach that argument. *East Valley Water*, 328 Or App at 793 n 2. WaterWatch does not renew that argument in its brief to this court, and we do not address it in this opinion.

"(a)   One or more of the criteria for establishing the presumption are not satisfied; or

"(b)   The proposed use will impair or be detrimental to the public interest as demonstrated in comments, in a protest under subsection (6) of this section[,] or in a finding of the department that shows:

"(A)   The specific public interest under ORS 537.170(8) that would be impaired or detrimentally affected; and

"(B)   Specifically how the identified public interest would be impaired or detrimentally affected."

(Emphasis added.) As discussed, both the commission and the Court of Appeals agreed with the protestants that the public interest set out in ORS 537.170(8)(f)—the public interest in "[a]ll vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights"—would be impaired or detrimentally affected by the proposed use because, as the commission explained, "[i]nsofar as the in-stream water right is for the purpose of providing the specified flows to support specific cutthroat trout life stages, inundation appears to defeat the beneficial purpose of the existing water right." *See also East Valley*, 328 Or App at 806 (concluding it unlikely that the legislature "intended that a junior water right would be permitted to frustrate the actual purpose and use of a senior water right"). East Valley contends that that conclusion applies an incorrect understanding of ORS 537.170(8)(f). It argues that ORS 537.170(8)(f) protects only the senior water-right holder's right to the quantity of water set out in the certificate, as measured at the location identified in the certificate. As East Valley explained at oral argument in this court, in its view, the effect of a proposed use on a certificate holder's beneficial use of water is immaterial if there is no adverse impact on the quantity of water that reaches the measuring point.

1.   *Attributes of a vested water right in general*

To determine what is required to demonstrate whether and, if so, how the public interest set out in ORS 537.170(8)(f) would be impaired or detrimentally affected by a proposed use, we must first determine the nature of the

interest protected by that paragraph. Before doing so, however, it is helpful to review, more generally, the attributes of a vested water right. As this court stated in *Fort Vannoy*:

> "'The elements of an appropriation of water *** are: (a) Quantity of water appropriated; (b) time, period, or season when the right to the use exists; (c) the place upon the stream at which the right of diversion attaches; (d) *the nature of the use or the purpose to which the right of use applies*, such as irrigation, domestic use, culinary use, commercial use, or otherwise; (e) the place where the right of use may be applied; [and] (f) the priority date of appropriation or right as related to other rights and priorities.'"

345 Or at 79-80 (quoting *Tudor v. Jaca et al.*, 178 Or 126, 142-43, 164 P2d 680 (1945) (internal quotation marks omitted; emphasis added)). Thus, a water right is a right to use a certain quantity of water, but, as the emphasized text makes clear, the nature or purpose of the use of the water is a distinct, integral aspect of a water right. That concept is reflected most clearly in ORS 540.610(1), which provides that "beneficial use" is the "basis, the measure and the limit of all rights to use of water" in the state. As the court stated in *Fort Vannoy*, beneficial use "is the foundation of an appropriative right." 345 Or at 87.

Other water rights statutes similarly reflect the central role that beneficial use plays under the prior appropriation doctrine. As we have explained, under that doctrine, beneficial use "is essential to the acquisition and maintenance of certificated water rights." *Id.* The Water Rights Act codifies that principle. For example, by requiring the department to approve all applications made in proper form that contemplate applying water to beneficial uses (and do not conflict with existing rights), ORS 537.160(1) effectively conditions the issuance of a certificate on the appropriated water having a beneficial use. Similarly, ORS 537.250(1) provides that, when an appropriation has been perfected in accordance with the act, the department "shall issue to the applicant a certificate of the same character as that described in ORS 539.140." ORS 539.140, in turn, provides, in relevant part:

"Upon the final determination of the rights to the waters of any stream, the Water Resources Department shall issue to each person represented in the determination a certificate setting forth the name and post-office address of the owner of the right; the priority of the date, *extent and purpose of the right*, and if the water is for irrigation purposes, a description of the legal subdivisions of land to which the water is appurtenant."

(Emphasis added.)

In addition, ORS 537.120 provides:

"Subject to existing rights, and except as otherwise provided in ORS chapter 538, all waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act and not otherwise; but nothing contained in the Water Rights Act shall be so construed as to take away or impair the vested right of any person *to any water or to the use of any water*."

(Emphasis added.) The previous version of that statute was part of the original 1909 Water Code. Or Laws 1909, ch 216, § 1. As enacted in 1909, the wording of that statute was similar to today's wording, but it did not include the specific protection for the vested right to "the use" of the water. The statute originally read as follows:

"Subject to existing rights, all waters within the state may be appropriated for beneficial use, as herein provided, and not otherwise; *but nothing herein contained shall be so construed as to take away or impair the vested right of any person, firm, corporation, or association, to any water*."

Lord's Oregon Laws, title XLII, ch VI, § 6594 (1910) (emphasis added). The statutory wording remained essentially unchanged until 1945, when the words "or to the use of any water" were added. Or Laws 1945, ch 58, § 1. We are aware of no legislative history explaining the legislature's decision to add that phrase to the statute, but the legislature's decision to add a second, differently worded phrase suggests that it meant for ORS 537.120 to protect two distinct attributes of a vested water right. *Marshall v. PricewaterhouseCoopers, LLP*, 371 Or 536, 555, 539 P3d 766 (2023) (in the absence of contrary evidence of legislative intent, "we generally assume that when the legislature uses different terms—at

least in the same statute—it intend[s] different meanings"). And that, in turn, suggests that, since at least the middle of the last century, the right to appropriate water for a beneficial use has been understood to be subject to not only senior vested rights to a specific quantity of water, but also to any such right to use that water for a specific beneficial purpose.

Importantly, it has long been understood under both the common law and the water-rights statutes that a water right does not entitle a holder to use a given quantity of water for just *any* beneficial use; rather, it is the right to use water in the manner set out in the application and determined to be beneficial by the department or commission. ORS 537.250(3) (providing that "[r]ights to the use of water acquired under the provisions of the Water Rights Act, as set forth in a certificate issued under this section, shall continue in the owner thereof so long as the water shall be applied to a beneficial use under and in accordance with the terms of the certificate," subject only to loss by, among other things, nonuse); ORS 537.120 ("all waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act and not otherwise"); *Teel Irrigation Dist.*, 323 Or at 668 ("The certificate represents a vested, perfected water right that continues so long as the water is applied to a beneficial use in accordance with the terms of the certificate, subject to loss by nonuse and other events."). Indeed, if water-rights holders wish to change the use they intend to make of the water, they must apply to the department for a water-rights transfer. ORS 540.520(1)(a) (so providing). Using water for some purpose other than the purpose set out in the relevant permit or certificate can lead to forfeiture of the water right. ORS 540.610(1), (2); *Rencken v. Young*, 300 Or 352, 364, 711 P2d 954 (1985) (cancelling certificate conferring right to use water from March to October because, for five consecutive years, certificate holder did not use water during those months; use of water during November months did not forestall forfeiture, because that was not the certificated use).[18]

---

[18] It follows that, if a proposed use were to preclude a senior water-right holder's beneficial use of the water under a certificate and the nonuse continued for five or more consecutive years, the senior holder would risk forfeiting the vested water right.

In that regard, the beneficial "use" underlying a water right *could* be viewed as a limitation on the right holder's own application of the water it appropriates, rather than something entitled to its own protection. As the foregoing discussion indicates, however, even though the specific designation of what water uses are allowed may impose such limitations, that does not mean that the specified use is not also entitled to protection against subsequent appropriators and their uses of the water. Indeed, that understanding is reflected in at least two United States Supreme Court opinions, including one predating the enactment of the Water Rights Act. In *Atchison v. Peterson*, 87 US (20 Wall) 507, 22 L Ed 414 (1874), the Supreme Court stated, "The right to water by prior appropriation *** is limited in every case, in quantity and quality, by the uses for which the appropriation is made." *Id.* at 514. The Court explained that the senior water-right holder has the right to insist that not only the amount, but also the quality, of the water should not be impaired so as to defeat the purpose of the appropriation. *Id.* The Court stated:

> "What diminution of quantity, or deterioration in quality, will constitute an invasion of the rights of the first appropriator will depend upon the special circumstances of each case, considered with reference to the uses to which the water is applied. A slight deterioration in quality might render the water unfit for drink or domestic purposes, whilst it would not sensibly impair its value for mining or irrigation. In all controversies, therefore, between him and parties subsequently claiming the water, the question for determination is necessarily whether his use and enjoyment of the water to the extent of his original appropriation have been impaired by the acts of the defendant."

*Id.* at 514-15.

In *Atchison*, the Court applied that principle but concluded that the deterioration in the quality of the water available to the senior water-right holder was very slight and did "not render the water to any appreciable extent less useful." *Id.* at 516. The Court reached a different result in *Arizona Copper Co. v. Gillespie*, 230 US 46, 33 S Ct 1004, 57 L Ed 1384 (1913). In that case, the downstream water-right holder had been using water from the Gila River for irrigation

for about 40 years. *Id.* at 52. Some 25 miles upstream, a mining company enlarged its copper ore treatment facility and permitted its waste material to enter small tributaries of the Gila River, which carried the waste downstream and polluted the water that the senior right holder used for irrigation. *Id.* In holding that the mining company's river-polluting activities could be enjoined, the Court observed that "[t]here is no question about the quantity of water appropriated by the upper user, the objection being that the quality of the water which comes down to the lower proprietor after it is used by the copper company is no longer fit for irrigation purposes." *Id.* at 55. That is, although the mining activities had no effect on the quantity of water available for the senior right holder's use, by impairing the beneficial use for which the water had been appropriated, those activities interfered with interests protected as part of the senior holder's water rights.

*Atchison* and *Arizona Copper Co.* thus indicate that the doctrine of prior appropriation has historically protected more than just the quantity of water to which a senior water-right holder is entitled; it has also protected the senior holder's right to use the water in a particular way, so as to prohibit subsequent appropriations that interfere with that use. That historical context suggests to us that, even long before it added explicit provisions to the Water Rights Act protecting the right "to the use of" water, the legislature would have understood the beneficial use for which water had previously been appropriated to be entitled to protection alongside the specific quantity of water that a water-right certificate guaranteed.

2.  *ORS 537.170(8)(f) specifically*

With that understanding of the scope of water rights generally, we turn to the specific question of how ORS 537.170(8)(f) works to protect those rights. We begin with the text of that paragraph, which, as noted, requires consideration of "[a]ll vested and inchoate rights to the waters of this state *or to the use of the waters* of this state, and the means necessary to protect such rights." (Emphasis added.) As the emphasized text indicates, the public interest factor in paragraph (8)(f) references not only senior rights to water,

but, separately, rights to "the use" of that water. And, as with ORS 537.120, the legislature's purposeful reference to both "the waters of this state" and "the use of the waters of this state" suggests that it intended that paragraph to protect two different attributes of a vested water right: the right to both (1) a particular quantity of water and (2) a particular use, namely, the beneficial use identified in the certificate.

The statutory context further suggests that the public interest can lie in protecting the beneficial purpose of a water right in addition to ensuring its availability. At least one of the other public interest factors listed in ORS 537.170(8) strongly indicates that the legislature intended to protect more than just quantities of water. Paragraph (8)(a) requires the director or commissioner to consider the public's interest in "[c]onserving the highest use of the water for all purposes," including, among other things, the use of water for "public recreation" and "scenic attraction," ORS 537.170(8)(a), which may at times not be solely tied to water quantity. For example, permitting the construction of a reservoir that would leave unusable mudflats exposed for part of the year might conflict with the public interest in maintaining a stream's scenic appeal, whether or not it reduced the quantity of water available at a particular place or time. By making such conflicts an appropriate consideration when reviewing water-rights applications, the legislature appears to have made protecting permitted water *uses* a separate consideration additional—if necessarily related—to water quantity.

ORS 537.153(2) provides additional contextual support for that understanding, because we generally construe statutes so as to give effect, if possible, to all their provisions. *See* ORS 174.010 (requiring that approach). As we have explained, that provision creates a rebuttable presumption that a proposed use will not impair or be detrimental to the public interest if, among other things, "the proposed use will not injure other water rights." And here the parties agree that a proposed use would "injure" other water rights under ORS 537.153(2) if the use would deprive other right holders of quantities of water to which they are entitled. Assuming for present purposes that the parties' understanding of

"injure" is correct, that meaning further suggests that ORS 537.170(8)(f) protects more than just water quantities. That is, although the presumption under ORS 537.153(2) can be overcome by a showing that the proposed use will, in fact, "injure" other water rights, *see* ORS 537.153(2)(a) (stating that the presumption is overcome if "[o]ne or more of the criteria for establishing the presumption are not satisfied"), it separately can be overcome under ORS 537.153(2)(b)(A) by a showing that "[t]he proposed use will impair or be detrimental to the public interest" based on at least one of the considerations listed under ORS 537.170(8). Because the presumption would already have been overcome under ORS 537.153(2)(a) if a proposed use would reduce the quantity of water available to another water-right holder, interpreting ORS 537.170(8)(f) as protecting only water quantities would effectively render that provision meaningless. In other words, if, as East Valley would have it, the consideration of "[a]ll vested and inchoate rights to the waters of this state or to the use of the waters of this state" applies only when a proposed use would deny a senior water-right holder the amount of water due, that consideration would be unnecessary, because that "injur[y]" would already have overcome the presumption of public interest under ORS 537.153(2)(a). In our view, it is unlikely that the legislature intended to limit the scope of ORS 537.170(8)(f) so as to render that provision largely superfluous. *See State ex rel Torres-Lopez v. Fahrion,* 373 Or 816, 832, __ P3d __ (2025) (describing the court's "surplusage principle," whereby the court seeks to avoid statutory interpretations that would lead to redundancy).

We turn to whether any legislative history sheds light on the legislative intent behind ORS 537.170(8)(f). The parties have not identified any legislative history specific to that point, nor have we found any. However, the enactment history of that paragraph shows that it was added to ORS 537.170 as part of a wide-ranging amendment to ORS chapter 537, which was designed to create a "coordinated, integrated state water resource policy" to be carried out by a single state agency, the State Water Resources Board. Or Laws 1955, ch 707, § 1(2), § 2(1). As part of that effort, the legislature amended ORS 537.170 to add four additional public interest considerations relevant to whether a proposed use would impair or be

detrimental to the public interest.[19] Or Laws 1955, ch 707, § 36. Among them was what is now codified as ORS 537.170(8)(f): "All vested and inchoate rights to the waters of this state or to the use thereof, and the means necessary to protect those rights." *Id.*; *former* ORS 537.170(2)(f) (1955).[20]

The statutory history does not reveal any particular reason for adding paragraph (8)(f) to the list of public interest considerations. East Valley argues, however, that, on the whole, the enactment history of the 1955 amendments to the Water Rights Act and, specifically, the enactment of ORS 537.170(8)(f), demonstrate that the legislature intended for ORS 537.170(8)(f) to protect only rights to water quantities, and not rights to the specific uses to which the water was to be put. East Valley recognizes that paragraph (8)(f) protects existing water rights "to the full extent reflected on a water-right permit or certificate and protected by the prior appropriation system," but, in East Valley's view, the water rights "reflected" and "protected" in that regard are rights to the specific quantities of water stated in each certificate, as measured at specific locations. That argument, however, overlooks the fact that a water-right certificate expressly confers both a right to water and a right to the beneficial use of that water. East Valley has not identified anything underlying the adoption of ORS 537.170(8)(f) that suggests that, by codifying existing principles of prior appropriation in the Water Rights Act and its amendments, the legislature intended for that paragraph to protect the rights that holders had to specific quantities of water while disregarding how that water was being used.

To summarize, a water right confers not just the right to a quantity of water, but also the right to continue

---

[19] Prior to the 1955 amendments, *former* ORS 537.170(2) (1953) set out only two public interest considerations: "conserving the highest use of the water for all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing or any other beneficial use to which the water may be applied for which it may have a special value to the public," and "the maximum economic development of the waters involved." Those two public interest factors remain in the current statute as ORS 537.170(8)(a) and (b).

[20] The legislature amended the wording of the public interest factor in paragraph (8)(f) to change "the use thereof" to "of the use of the waters of this state" in 1985. Or Laws 1985, ch 673, § 30.

the specified beneficial use of that water. In other words, the nature or purpose of the use stated in a water-right certificate is a distinct, integral aspect of a water right entitled to protection. Thus, in making "[a]ll vested and inchoate rights to the waters of this state or to the use of the waters of this state" a factor to be considered in determining the public interest, the legislature implicitly recognized the need to protect both of those rights and expressly required the director or the commission to consider them *both* before making a final decision whether to issue a new water-right certificate. The commission did that here and, based upon that consideration, determined that the use proposed by East Valley would impair or detrimentally affect the specific use underlying Certificate 72591. Because that was an appropriate consideration, it follows that the Court of Appeals did not err in affirming the commission's reliance on ORS 537.170(8)(f) to conclude that the rebuttable presumption that East Valley's proposed water use was in the public interest had been overcome because that use would frustrate the beneficial purpose of a senior water right.

B. *Requirements For Denying Application After Commission Concludes that Rebuttable Presumption of Public Interest Under ORS 537.530(2) Has Been Overcome*

East Valley alternatively argues that the Court of Appeals erred in failing to recognize that the commission was required to consider all seven public interest factors listed in ORS 537.170(8)(a) to (g)—balancing them against one another—before determining that the proposed use was not in the public interest.[21] As noted, East Valley's first alternative argument is that the commission was required to engage in that balancing even before it could determine

---

[21] As we will explain, consideration of those factors is triggered by two different provisions: First, it is triggered indirectly under ORS 537.153(2), which provides that the presumption of public interest can be overcome if a preponderance of the evidence shows that one or more of the seven public interest factors would be adversely affected by a proposed use. Second, it is triggered directly, under ORS 537.170(8), which provides:

"If the presumption of public interest under ORS 537.153(2) is overcome, then before issuing a final order, the director or the commission *** shall make the final determination of whether the proposed use *** would impair or be detrimental to the public interest by considering [the seven factors listed in ORS 537.170(8)(a) to (g)]."

that the presumption of public interest had been rebutted under ORS 537.153(2) (providing various ways in which the presumption may be overcome). But perhaps recognizing that the clear text of ORS 537.153(2)(b)(A) strongly suggests otherwise, East Valley appears to put more weight on its second alternative argument: that, even if the commission could rely on a single public interest factor in determining that the presumption of public interest had been overcome, the commission was required to consider all seven public interest factors listed under ORS 537.170(8) before making its final determination that East Valley's proposed use was not in the public interest.

Respondents acknowledge that, in its final order denying East Valley's application, the commission did not expressly discuss any public interest consideration other than ORS 537.170(8)(f). Respondents argue, however, that, as the commission itself concluded, it was not required to consider the other public interest factors unless it intended to grant East Valley's application despite its determination that the presumption of public interest had been overcome.[22] Here, respondents argue, because the commission properly denied East Valley's application based on ORS 537.170(8)(f) and did not intend to grant East Valley's application, it was not required to consider any of the other listed factors. Respondents alternatively argue that, if this court were to conclude that ORS 537.170(8) required the commission to consider the other listed factors before making its final determination, then the court should deem the commission to have done so by adopting, in their entirety, the director's factual findings, which did expressly discuss each of the public interest factors listed under ORS 537.170(8). As we will explain, we conclude that, upon determining that the public interest presumption had been overcome, the commission was then required by ORS 537.170(8) to consider all seven of the public interest factors listed in that subsection before making its final determination that East Valley's proposed use would impair or be detrimental to the public interest.

---

[22] As we discuss in greater detail below, the commission relied for that purpose on a commission rule, OAR 690-310-0120(5), which requires the department or commission to make specific findings regarding the public interest factors if it intends to issue a permit after determining that the presumption of public interest has been overcome. 374 Or at 180-81.

We further conclude that neither the record nor the commission's final order itself can support the contention that the commission implicitly considered all seven factors when it adopted the director's factual findings. Thus, the Court of Appeals erred in affirming the commission's order.

We begin by observing that East Valley's first argument—that the commission was required to consider all seven public interest factors before concluding that the public interest presumption had been rebutted—requires little discussion. In our view, that argument is effectively foreclosed by the plain language of ORS 537.153(2), which indicates that the rebuttable presumption may be overcome by a showing that the proposed use would have a detrimental effect on a single public interest listed under ORS 537.180(8):

> "[The] rebuttable presumption *** may be overcome by a preponderance of evidence that ***
>
> "*****
>
> "(b)   The proposed use will impair or be detrimental to the public interest as demonstrated *** in a finding of the department that shows:
>
> "(A)   *The* specific public interest under ORS 537.170(8) that would be impaired or detrimentally affected; and
>
> "(B)   Specifically how *the identified public interest* would be impaired or detrimentally affected."

(Emphases added.) Both subparagraphs (A) and (B) use the definite article "the" in reference to "the" public interest listed under ORS 537.170(8) that the commission might rely on in determining that the presumption has been overcome. Similarly, each of those provisions also uses the singular "public interest" in reference to individual items on that list, and subparagraph (B) makes the point even clearer by referencing "the *identified* public interest." (Emphasis added.) Each of those legislative choices strongly suggests to us that the commission may rely on a single public interest factor when concluding that the public interest presumption has been rebutted, and nothing in the text, context, or legislative history of ORS 537.153(2) can support interpreting that provision to require that the commission consider—much less balance—more than one public interest factor at that

stage of its review. *See State ex rel. Rosenblum v. Nisley*, 367 Or 78, 83, 473 P3d 46 (2020) (because the words of a statute are the best evidence of the legislature's intent, we give "primary weight to the [statute's] text and context"); *see also* ORS 174.010 (courts may not add to statutes content omitted by legislature). Thus, we are not persuaded by that aspect of East Valley's argument.

East Valley's second alternative argument, however, warrants greater consideration. East Valley contends that, at a minimum, once the commission determined that the presumption of public interest had been overcome, it was then required by ORS 537.170(8) to consider all seven of the public interest factors set out in that subsection and balance them against one another before making its final determination of whether the proposed use would be in the public interest. According to East Valley, because the commission never engaged in that broader inquiry, it erred in ultimately concluding that the proposed use would not be in the public interest and in denying East Valley's application on that basis. Here we agree with East Valley.

ORS 537.170(8) provides:

> "If the presumption of public interest under ORS 537.153(2) is overcome, then before issuing a final order, the director or the commission, if applicable, shall make the final determination of whether the proposed use or the proposed use as modified in the proposed final order would impair or be detrimental to the public interest by considering [the seven listed public interest factors]."

The Court of Appeals appears to have agreed with the commission's understanding that, because the commission did not intend to grant East Valley's application, it was not required to consider any of the public interest factors other than ORS 537.170(8)(f), the factor that it relied on in determining that the public interest presumption had been overcome. *East Valley Water*, 328 Or App at 807.[23] Here, in

---

[23] The Court of Appeals observed that a commission rule, OAR 690-310-0120(5), requires the commission to make specific findings demonstrating its consideration of all seven public interest factors before an application may be *granted* in a case in which the public interest presumption has been overcome. *East Valley Water*, 328 Or App at 807 n 13. On its face, OAR 690-310-0120(5) requires the commission to deny a permit unless it makes those findings, and, unlike ORS

contrast to East Valley's previous argument, the plain statutory text strongly *supports* East Valley's view that the commission was required to consider all seven public interest factors, and respondents do not seriously contend otherwise.

The text of ORS 537.170(8) contemplates a two-step process. The first clause of that section—"If the presumption of public interest under ORS 537.153(2) is overcome"—reflects the first step (which occurs under ORS 537.153(2)), in which the presumption may be overcome due to a proposed use's adverse effect on one of the public interest factors listed in ORS 537.170(8). The second clause—"*then* before issuing a final order" (emphasis added)—announces the second step, which occurs *after* the presumption has been rebutted and has separate procedural requirements. ORS 537.170(8). And in describing that second step, the statute expressly requires the director or commission to "*make the final determination* of whether the proposed use or the proposed use as modified in the proposed final order would impair or be detrimental to the public interest *by considering*" the seven listed public interest factors that follow—paragraphs (8)(a) through (g). *Id*. (emphases added).

Respondents urge us to adopt what they understand to be the Court of Appeals' rationale: that, because the commission did not grant East Valley's application, the commission was not required to consider the public interest factors any further. However, respondents make no effort to support that conclusion based on the text of ORS 537.170(8) or any other statutory provision, nor can we conceive of any viable argument that a statutory directive to consider seven factors does not, in fact, require that consideration. Instead, respondents contend that, if this court concludes that the commission was required to consider the other public factors before issuing its final order, then we should deem it to have fulfilled that obligation by adopting the director's

_____

537.170(8), that rule does not explicitly require the commission to further consider the public interest factors before issuing a *denial*. Although the Court of Appeals did not explain its reliance on OAR 690-310-0120(5), we observe that it could not have reasoned that the commission's rule somehow superseded its statutory obligations under ORS 537.170(8), as it could not have had that effect. *See Torres-Lopez*, 373 Or at 834 n 14 ("To the extent that *** administrative rules conflict with [a statute], the statute controls.").

factual findings, which did consider the other factors. We disagree.

Respondents are correct that, in initially *approving* East Valley's water-right application, the director expressly considered each of the public interest factors under ORS 537.170(8). But respondents' argument—that, by adopting the director's findings, the commission satisfied its own obligation to consider those factors—has two flaws. One is that the director's final order uniformly determined that the public factor considerations *favored* granting East Valley's application. If, in fact, the commission had adopted those findings in support of *rejecting* the application with no explanation, then that might well have raised questions as to whether the commission's final order was supported by substantial evidence and reason, as East Valley has separately argued.

We need not decide that issue, however, due to the second, more significant flaw: In its final order denying East Valley's application, the commission expressly disavowed any need to consider the remaining factors. The final order acknowledges the list of factors under ORS 537.170(8) that must be considered, but it describes the obligation to consider them as arising only under limited circumstances, namely,

> "if, after a protest is filed, the Department or Commission determines that the presumption is overcome but that the permit should, notwithstanding that determination, be issued because it will not impair or be detrimental to the public interest[.]"

Here, of course, the commission determined that the permit should *not* be issued. And as to that circumstance, the final order made clear that the commission did not understand there to be any obligation to consider the remaining public interest factors. Citing OAR 690-310-0120(5), the final order states:

> "If, after a protest is filed, the Department or the Commission determines that the application should be denied because the presumption is overcome, the Department or the Commission *need not consider* the

factors in ORS 537.170(8) to determine whether the pro-
posed use should nonetheless be allowed."

(Emphasis added.) Following that statement, the final order
never mentions any of the ORS 537.170(8) public interest fac-
tors—or the director's discussion of them—other than ORS
537.170(8)(f). The final order discusses that paragraph at
considerable length, but exclusively in connection with the
commission's conclusions that the public interest presump-
tion had been rebutted and that no modifications would
allow the proposed use to comport with the public interest
so as to allow for its approval.

    The commission's express disavowal of any need to
consider the remaining public interest factors, together with
the final order's omission of any reference to them or to the
director's related findings in the order's "Analysis" section,
is simply irreconcilable with respondents' contention that
the commission implicitly considered those factors in mak-
ing its final determination of whether East Valley's proposed
use would impair or be detrimental to the public interest.
Rather, we view the only reasonable understanding of the
final order to be that the commission did not interpret ORS
537.170(8) to require it to consider the other factors, and so
it did not do so here. As a result, the commission's final order
reflects an erroneous interpretation of law, and, accordingly,
the Court of Appeals erred in affirming that order.[24]

    Given our conclusion that the commission acted
under an erroneous interpretation of law, the appropriate
disposition is to remand this case for further action, where
the commission will presumably consider the required fac-
tors in the first instance. *See* ORS 183.482(8)(a)(B) (per-
mitting court to remand erroneous order for further action

---

[24] In his dissenting opinion, Justice Bushong reaches the opposite conclu-
sion—that the commission implicitly considered all seven public interest factors
before making its final determination. 374 Or at 186-87 (Bushong, J., dissenting).
In Justice Bushong's view, the commission's statement that it "need not consider"
the other factors simply meant that it "need not consider them *again*." *Id*. (empha-
sis in original). For the reasons set forth in the text, we respectfully disagree
with that understanding of the final order. For similar reasons, we disagree with
the dissent's view that the error that this opinion finds is simply that the commis-
sion failed to expressly state that it was considering the other factors. *Id*. (slip op
at 6). The error that we find is that the commission did not consider those factors,
not that it merely failed to expressly state that it was doing so.

under correct interpretation of the law). That, in our view, obviates the need to consider East Valley's argument that, to "consider" the public interest factors as required under ORS 537.170(8), the commission must "balance" those considerations against one another before reaching its final determination whether to grant East Valley's application. To the extent that the commission or other participants dispute the district's contention that "consider[ation]" under ORS 537.170(8) requires the commission to balance the various public interest factors, the parties are free to make their competing arguments to the commission on remand.[25]

### III.   CONCLUSION

We conclude that the Court of Appeals erred, in part, in affirming the commission's final order in this case. That court—and the commission—did *not* err when they interpreted the statutorily recognized public interest in "vested and inchoate" water rights and "the means necessary to protect such rights" as protecting both the quantity of water guaranteed to a senior water-right holder *and* the beneficial use associated with those rights. Thus, the commission did not err in relying on a finding that the beneficial purpose of a senior water right would be frustrated by the proposed use in determining that the public interest presumption had been rebutted. However, the commission did err when it interpreted ORS 537.170(8) to require consideration of all seven public interest factors only if it intended to grant East Valley's application despite having determined that the presumption had been overcome. Because the commission relied on that erroneous interpretation in its final order, the Court of Appeals erred in affirming that order, which we remand for further proceedings under the correct interpretation of the law.

The decision of the Court of Appeals is affirmed in part and reversed in part. The order of the Water Resources Commission is reversed, and the case is remanded to the Water Resources Commission for further proceedings.

---

[25] Given our disposition in this case, we also do not consider it necessary to address East Valley's other arguments related to substantial evidence and reasoning, as the underlying aspects of the commission's final order are likely to differ on remand.

**BUSHONG, J.,** dissenting.

East Valley Water District (East Valley) applied for a permit to store water for irrigation in a reservoir to be created by building a dam on Drift Creek—a tributary of the Pudding River. The Oregon Water Resources Commission (commission) denied East Valley's application, concluding that issuing the permit was not in the public interest because the proposed dam would inundate Drift Creek, contrary to an existing instream water right issued for the purpose of providing the stream flows needed for cutthroat trout habitat. The majority opinion agrees with the Court of Appeals that the commission was entitled to consider the beneficial purpose of the existing instream water right in determining whether the dam proposed by East Valley was in the public interest. I agree. However, I disagree with the majority opinion's further conclusion that the commission erred in failing to consider all statutorily required public interest factors when it denied East Valley's application. That conclusion leads the majority opinion to remand the final order to the commission for consideration of those factors. Because I would affirm the final order, I dissent.

In my view, the commission's consideration of *all* public interest factors listed in the statute was part of its decision to deny East Valley's application. The commission was required by statute to consider those factors before it could issue its final order. The commission acknowledged that requirement and listed the public interest factors in its final order. The majority opinion concludes that the commission nonetheless failed to consider them, because (1) it did not expressly state that it had considered them, and (2) a statement in the commission's final order, read in isolation, suggests that the commission did *not* consider those factors. I disagree. As I will explain, the commission's final order, read in its entirety and in the context of the administrative process and the governing statutory provisions, leads me to conclude that the commission complied with the statutory requirements, considered all the public interest factors, and concluded that those factors did not justify issuing the permit that East Valley had requested. Thus, there is no reason to remand the final order to the commission for

"consideration" of public interest factors that the commission has already considered.

As the majority opinion explains, the initial review of an application starts with a rebuttable presumption that the proposed use will not impair or be detrimental to the public interest if four criteria are met. ORS 537.153(2). In this case, everyone agrees that those four criteria were met. The initial review of East Valley's application led to a *proposed* final order that would have granted East Valley's application in the public interest. Protests were filed and a hearing was held before an administrative law judge, resulting in another *proposed* final order. Exceptions were filed and the commission ultimately issued a *final* order denying East Valley's application.

The commission concluded in its final order that the protestants opposing East Valley's application had overcome the presumption that East Valley's proposed use would not impair or be detrimental to the public interest. Specifically, the commission determined that the dam that East Valley proposed to construct would lead to the inundation of Drift Creek, thereby eliminating the benefit that the existing instream water right provided for cutthroat trout habitat, contrary to the public interest consideration identified in ORS 537.170(8)(f) (requiring consideration of "[a]ll vested and inchoate rights to the waters of this state or to the use of the waters of this state, and the means necessary to protect such rights").

Under the governing statutes, the commission's determination that the presumption had been overcome meant that East Valley's proposed use "will impair or be detrimental to the public interest"—and thus required the commission to deny the application—unless it concluded after considering all the public interest factors that the proposed use would not impair or be detrimental to the public interest. *See* ORS 537.153(2) (stating that the rebuttable presumption that the proposed use will not impair or be detrimental to the public interest may be overcome by a showing that "[t]he proposed use will impair or be detrimental to the public interest" as demonstrated in a finding that shows "[t]he specific public interest under ORS 537.170(8) that would be

impaired or detrimentally affected"); ORS 537.170(6) (stating that, if the commission determines that a proposed use would "impair or be detrimental to the public interest" it "shall issue a final order rejecting the application," but if it determines that the proposed use "would not impair or be detrimental to the public interest" it "shall issue a final order approving the application").

ORS 537.170(8) provides that, "before issuing a final order," the commission "shall make the final determination of whether the proposed use * * * would impair or be detrimental to the public interest by considering" the seven factors listed in the statute. That requirement is prefaced with the words, "[i]f the presumption of public interest under ORS 537.153(2) is overcome[.]" Thus, the text of ORS 537.170(8) requires the commission to first determine whether the presumption of public interest is overcome, and, if so, it must then consider the seven listed public interest factors "before issuing a final order."

Reading those requirements in the context of ORS 537.153(2) and ORS 537.170(6) means that (1) impairing or detrimentally affecting *one* of the "specific public interest[s]" listed in ORS 537.170(8) is enough to overcome the presumption of public interest; and (2) overcoming the presumption requires the commission to issue a final order denying an application for a proposed use, *unless* (3) the commission concludes after considering *all* the public interest factors listed in the statute that the application should be granted despite the impairment or detrimental effect that the proposed use would have on one or more of those factors.[1] That reading necessarily requires the commission to consider *all* the listed factors in deciding whether it should (1) approve

_____

[1] The commission and the Court of Appeals both read the statutes the same way. An implementing rule, OAR 690-310-0120(5), states that, if the presumption that a proposed use will not impair or detrimentally affect the public interest is overcome, the commission "shall issue a final order * * * denying the application unless [the commission] makes specific findings to demonstrate that considering all of the public interest factors listed in ORS 537.170(8) the issuance of a permit will not impair or be detrimental to the public interest." The commission quoted that rule in its final order in this case. The Court of Appeals agreed with the commission's reading of the statute. *East Valley Water v. Water Resources Commission*, 328 Or App 790, 807 n 13, 539 P3d 789 (2023) (explaining that the commission was required to consider all the public interest factors if it decided to grant an application after determining that the presumption had been overcome).

an application even though the rebuttable presumption had been overcome, or (2) deny the application.

As applied here, ORS 537.170(6) would have required the commission to *approve* East Valley's application *if* it had concluded—after considering all the factors listed in ORS 537.170(8)—that East Valley's proposed use would not impair or be detrimental to the public interest, despite the impairment or detrimental effect it would have on the existing instream water rights. Because the commission denied East Valley's application, it did not conclude that the public interest factors—considered in their entirety—tipped the public interest scales in favor of issuing the requested permit. If the commission had reached that conclusion, then ORS 537.170(6) would have required it to approve East Valley's application.[2]

The majority opinion concludes that the commission did not "consider" all the public interest factors when it denied East Valley's application because the commission did not expressly *say* that it had considered those factors. But as explained below, it listed those factors in its final order and acknowledged that it "must consider" them if it decided that the permit that East Valley had requested "should * * * be issued" even though the presumption had been overcome. The commission did not need to expressly state that it *had* considered those factors because doing so was implicit in its decision to deny the requested permit.

The majority opinion reads a statement in the commission's final order as an acknowledgment that the commission simply did not consider the statutory factors at all. The commission stated in its final order that, if it "determines that the application should be denied," it "need not consider the factors in ORS 537.170(8) to determine whether the proposed use should nonetheless be allowed." That statement must be read in context. Immediately before making that statement, the commission listed *all* the statutory public interest factors and acknowledged that it "must consider"

_____

[2] The commission noted in its final order that, "[o]n a different record, or with a different in-stream water right" it "might well arrive at a different decision." But as the commission observed, East Valley's application and the record here "provide scant detail about the actual construction or operation of the [proposed] reservoir."

those factors if it "determines that the presumption is overcome but that the permit should, notwithstanding that determination, be issued because it will not impair or be detrimental to the public interest." In other words, by expressly acknowledging that it "must consider" the factors in deciding whether the permit should be "issued," the commission necessarily implied that it *had* considered all the factors in deciding that the permit should not be issued. That is so because, having determined that the presumption had been overcome, the commission's decision to deny the application could only have been made if, after consideration of the factors, it could not make the required determination that issuance of the permit would not impair or be detrimental to the public interest. I read the statement cited by the majority opinion, in context, to mean that the commission need not consider those factors *again* because it already considered them when it decided that East Valley's requested permit should not "be issued."

The error in the commission's decision identified by the majority opinion, in my view, boils down to a failure to *expressly state* that it had considered all the public interest factors when it decided to deny East Valley's application, not a failure to consider those factors at all. That makes the remand ordered by the majority opinion largely a meaningless gesture. On remand, the commission need only state expressly what is implicit in its original order: that after considering all the public interest factors listed in ORS 537.170(8), it has concluded that East Valley's proposed use should be denied. I do not see the point in remanding to require the commission to state explicitly what is already implicit in its final order.

Because East Valley has not established that the commission erred in denying its permit application, I would affirm the Court of Appeals' decision that affirmed the commission's final order. Accordingly, I respectfully dissent.